**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

AMERICAN FREEDOM DEFENSE
INITIATIVE; *et al*.,

             Plaintiffs,

    -v.-

METROPOLITAN TRANSPORTATION
AUTHORITY ("MTA"); *et al*.,

             Defendants.

Case No. 1:14-cv-07928-JGK

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF CONTENTS........................................................................................................... i

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ................................................................................................................1

STATEMENT OF FACTS ....................................................................................................3

ARGUMENT ......................................................................................................................10

I.      Standard for Issuing a Preliminary Injunction ..................................................10

II.     Plaintiffs Are Likely to Succeed on the Merits of Their First Amendment Challenge
        to the MPTA's Prior Restraint on Their Speech ...............................................11

        A.      Plaintiffs' Advertisement Is Protected Speech ......................................12

        B.      The MTA Created a Public Forum for Plaintiffs' Speech ....................12

        C.      The MTA's Prior Restraint on Plaintiffs' Speech Cannot Survive Constitutional
                Scrutiny ..................................................................................................15

                1.      The MTA's Speech Restriction Is Content Based ....................15

                2.      The MTA's Speech Restriction Is Unconstitutional Both Facially and
                        As Applied ...............................................................................17

                        a.      The MTA's Advertising Standard Facially and as Applied Ignores
                                *Brandenburg*'s Intentionality Requirement .........................18

                        b.      The MTA's Rationale Is Not Based on Actual Facts .........................20

                        c.      The MTA's Security Assessment Contradicts the Known Facts.........21

                        d.      The MTA's Censorship Is the Most Restrictive, Not the Least..........23

III.    Plaintiffs Will Suffer Irreparable Harm in the Absence of Injunctive Relief...................24

IV.     The Balance of Equities Tips Sharply in Favor of Granting the Injunction ......................24

V.      Granting the Injunction Is in the Public Interest ...............................................25

CONCLUSION.....................................................................................................................25

i

CERTIFICATE OF SERVICE ........................................................................................27

## TABLE OF AUTHORITIES

**Cases**

*Am. Freedom Def. Initiative v. Metro. Transp. Auth.*,
  880 F. Supp. 2d 456 (S.D.N.Y. 2012).............................................................*passim*

*Am. Freedom Def. Initiative v. Metro. Transp. Auth.*,
  889 F. Supp. 2d 606 (S.D.N.Y. 2012)......................................................................25

*Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*,
  898 F. Supp. 2d 73 (D.D.C. 2012) ...................................................................16, 23

*AT&T v. Winback & Conserve Program*,
  42 F.3d 1421 (3d Cir. 1994)...................................................................................11

*Bantam Books, Inc. v. Sullivan*,
  372 U.S. 58 (1963)..................................................................................................11

*Brandenburg v. Ohio*,
  395 U.S. 444 (1969).......................................................................................... 17-18

*Carey v. Brown*,
  447 U.S. 455 (1980)................................................................................................12

*Ctr. for Bio-Ethical Reform, Inc. v. L.A. Cnty. Sheriff Dep't*,
  533 F.3d 780 (9th Cir. 2008) ............................................................................... 1-2

*City of Los Angeles v. Preferred Communications, Inc.*,
  476 U.S. 488 (1986)................................................................................................21

*Connick v. Myers*,
  461 U.S. 138 (1983)................................................................................................12

*Consol. Edison Co. of N.Y. v. Pub. Serv. Comm. of N.Y.*,
  447 U.S. 530 (1980)................................................................................................15

*Cornelius v. NAACP Legal Def. & Educ. Fund*,
  473 U.S. 788 (1985)......................................................................................... 12-15

*Deeper Life Christian Fellowship, Inc. v. Board of Educ.*,
  852 F.2d 676 (2d Cir. 1988)....................................................................................24

*Elrod v. Burns*,
  427 U.S. 347 (1976)............................................................................................3, 24

*Feiner v. New York,*
    340 U.S. 315 (1951) ................................................................................ 1, 18-19

*Forsyth Cnty. v. Nationalist Movement,*
    505 U.S. 123 (1992) ............................................................................2, 15, 18

*Glasson v. Louisville,*
    518 F.2d 899 (6th Cir. 1975) ..........................................................................1

*Gordon v. Holder,*
    721 F.3d 638 (D.C. Cir. 2013) .....................................................................25

*Grace Bible Fellowship, Inc. v. Maine Sch. Admin. Dist. No. 5,*
    941 F.2d 45 (1st Cir. 1991) ..........................................................................14

*Hague v. CIO,*
    307 U.S. 496 (1939) .....................................................................................13

*Hedges v. Wauconda Cmty. Unit Sch. Dist. No. 118,*
    9 F.3d 1295 (7th Cir. 1993) .....................................................................1, 19

*Lebron v. Wash. Metro. Area Transit Auth.,*
    749 F.2d 893 (D.C. Cir. 1984) ................................................................ 11-12

*Lehman v. City of Shaker Heights,*
    418 U.S. 298 (1974) .....................................................................................14

*Lewis v. Wilson,*
    253 F.3d 1077 (8th Cir. 2001) .................................................................1, 19

*Locurto v. Giuliani,*
    447 F.3d 159 (2d Cir. 2006) ....................................................................1, 19

*Melzer v. Bd. of Educ.,*
    336 F.3d 185 (2d Cir. 2003) ................................................................. 18-21

*Members of the City Council v. Taxpayers for Vincent,*
    466 U.S. 789 (1984) .....................................................................................21

*Metro. Taxicab Bd. of Trade v. City of N.Y.,*
    615 F.3d 152 (2d Cir. 2010) .........................................................................10

*NAACP v. Claiborne Hardware Co.,*
    458 U.S. 886 (1982) .....................................................................................12

*Nat'l Grp. for Communs. & Computers Ltd. v. Lucent Techs. Int'l Inc.*,
    331 F. Supp. 2d 290 (D.N.J. 2004) ...................................................................20

*Newsom v. Norris*,
    888 F.2d 371 (6th Cir. 1989) ..........................................................................24

*N.Y. Magazine v. Metro. Transp. Auth.*,
    136 F.3d 123 (2d Cir. 1998) ..................................................................... *passim*

*Olivieri v. Ward*,
    766 F.2d 690 (2d Cir. 1985) ...........................................................................21

*Olivieri v. Ward*,
    801 F.2d 602 (2d Cir. 1986) ...........................................................................21

*Perry Educ. Ass'n v. Perry Local Educators*,
    460 U.S. 37 (1983) ..................................................................................... 13-14

*R.A.V. v. St. Paul*,
    505 U.S. 377 (1992) .......................................................................................15

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995) .......................................................................................15

*Swartzwelder v. McNeilly*,
    297 F.3d 228 (3d Cir. 2002) ...........................................................................24

*Sindicato Puertorriqueño de Trabajadores v. Fortuño*,
    699 F.3d 1 (1st Cir. 2012) ..............................................................................11

*Smith v. Ross*,
    482 F.2d 33 (6th Cir. 1973) ..............................................................................1

*S.O.C., Inc. v. Cnty. of Clark*,
    152 F.3d 1136 (9th Cir. 1998) ........................................................................15

*Terminiello v. Chicago*,
    337 U.S. 1 (1949) ..................................................................................... 20-21

*Texas v. Johnson*,
    491 U.S. 397 (1989) .......................................................................................23

*Turner Broad. Sys., Inc. v. F.C.C.*,
    512 U.S. 622 (1994) .......................................................................................15

*United States v. Alvarez,*
    132 S. Ct. 2537 (2012)...................................................................................17

*United States v. Rowlee,*
    899 F.2d 1275 (2nd Cir. 1990).......................................................................18

*United States v. Freeman,*
    761 F.2d 549 (9th Cir. 1985) .........................................................................18

*United States v. Rahman,*
    189 F.2d 88 (2nd Cir. 1998)...........................................................................18

*W. Va. State Bd. of Educ. v. Barnette,*
    319 U.S. 624 (1943)..........................................................................................1

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7 (2008)............................................................................................10

## STATUTES

42 U.S.C. § 1983.....................................................................................................4

## RULES

Fed. R. Civ. P. 65.................................................................................................25

## INTRODUCTION

Government censorship is repugnant to our Constitution, and for good reason. "If there is any fixed star in our constitutional constellation, it is that <u>no</u> official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) (emphasis added). To protect this first freedom of political liberty in a free society, courts have long recognized that the First Amendment is not so weak as to crumble in the face of hecklers or even unruly mobs. *Feiner v. New York*, 340 U.S. 315, 320 (1951) ("[T]he ordinary murmurings and objections of a hostile audience cannot be allowed to silence a speaker."); *Locurto v. Giuliani*, 447 F.3d 159, 179 (2d Cir. 2006) (observing that the "Supreme Court has long regarded" a heckler's veto "as generally impermissible"); *Hedges v. Wauconda Cmty. Unit Sch. Dist. No. 118*, 9 F.3d 1295, 1299 (7th Cir. 1993) ("Consider a parallel: the police are supposed to preserve order, which unpopular speech may endanger. Does it follow that the police may silence the rabble-rousing speaker? Not at all. The police must permit the speech and control the crowd; there is no heckler's veto."); *Smith v. Ross*, 482 F.2d 33, 37 (6th Cir. 1973) ("[T]he Supreme Court has often emphasized [that] state officials are not entitled to rely on community hostility as an excuse not to protect, by inaction or affirmative conduct, the exercise of fundamental rights."); *Glasson v. Louisville*, 518 F.2d 899, 905-06 (6th Cir. 1975) ("[T]o punish for incitement or breach of the peace the peaceful communication of . . . messages because other persons are provoked and seek to take violent action against the speaker would subvert the First Amendment, and would incorporate into that constitutional guarantee a 'heckler's veto' which would empower an audience to cut off expression of a speaker with whom it disagreed."); *Lewis v. Wilson*, 253 F.3d 1077, 1082 (8th Cir. 2001) ("The First Amendment knows no heckler's veto."); *Ctr. for Bio-Ethical Reform, Inc. v. L.A. Cnty. Sheriff Dep't*, 533 F.3d 780,

790 (9th Cir. 2008) ("Whether prospectively, as in *Forsyth County*, or retrospectively, as in the case before us, the government may not give weight to the audience's negative reaction.").

This case is not even a close call.  The MTA has fabricated an invisible, yet incredibly malleable and naïve jihadist heckler based on an entirely dubious factual predicate and handed this invisible thug a weapon far more dangerous to our liberty than a handgun or a machete: government censorship servicing the ends of the jihadists—the destruction of our liberty.

Specifically, Defendants prohibited Plaintiffs from displaying an advertisement (hereinafter referred to as the "Hamas Killing Jews Advertisement") on MTA advertising space based on Defendants' assertion that Plaintiffs' message will be understood not as parody or criticism of a notion of "peaceful jihad" but literally a determined call for Muslims to murder Jews. The problem with Defendants' claim is fourfold.  ***First***, it is a misreading of *Brandenburg*'s requirement of ***intentionality*** to incite imminent and likely violence.  ***Second***, it is based upon a factual assumption about the viewer's understanding of context that is unrealistic and counterfactual.  ***Third***, not only is the MTA's threat assessment based on zero empirical evidence of an actual threat, it contradicts the undisputed evidence that the same advertisement has run in other large cities without incident whatsoever and thus fails *Brandenburg*'s "imminent" and "likely" prongs.  And ***fourth***, even assuming *arguendo* that it would be *likely* that some jihadist living in the midst of peaceful New Yorkers would take the Hamas Killing Jews Advertisement as a kind of *fatwa* to attack and murder Jews, and assuming *arguendo* that this jihadist would act *imminently*—and all because he would have missed the point of the parody—the MTA could have chosen any number of less restrictive alternatives other than a blanket censorship.

Defendants' speech restriction, facially and as applied to censor Plaintiffs' message, is a content- and viewpoint-based prior restraint on Plaintiffs' speech in violation of the First

Amendment.   Pursuant to clearly established jurisprudence, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" sufficient to warrant the requested injunction.   *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *N.Y. Magazine v. Metro. Transp. Auth.*, 136 F.3d 123, 127 (2d Cir. 1998) (same).

In sum, Plaintiffs' satisfy the standard for issuing a preliminary injunction.

## STATEMENT OF FACTS

Plaintiff AFDI is a nonprofit organization that is incorporated under the laws of the State of New Hampshire.  AFDI is dedicated to freedom of speech, freedom of conscience, freedom of religion, and individual rights.  (Pamela Geller Declaration filed concurrently herewith ("Geller Decl.") ¶¶ 3-4).

AFDI achieves its objectives through a variety of lawful means, including through the exercise of its right to freedom of speech under the U.S. Constitution.  (Geller Decl. ¶¶ 4-5).

AFDI exercises its right to freedom of speech and promotes its objectives by, *inter alia*, purchasing advertising space on transit authority property in major cities throughout the United States, including New York City.  AFDI purchases these advertisements to express its message on current events and public issues, including issues such as Islam's hatred of Jews (hereinafter referred to as "AFDI's advertising campaign").  (Geller Decl. ¶¶ 5-6).

Plaintiff Pamela Geller is the president of AFDI, and she engages in protected speech through AFDI's activities, including AFDI's advertising campaign.   (Geller Decl. ¶¶ 1-2, 7). Plaintiff Robert Spencer is the vice president of AFDI, and he engages in protected speech through AFDI's activities, including AFDI's advertising campaign.  (Geller Decl. ¶¶ 2, 7).

The MTA is a public benefit corporation created by New York state law. It operates buses, subways, and regional rail lines in and around the New York metropolitan area.[1]  (Geller Decl. ¶ 8).

Defendant Thomas F. Prendergast, is, and was at all relevant times, the Chairman and Chief Executive Officer of the MTA.  In that capacity, Defendant Prendergast is responsible for adopting, creating, and enforcing the policies and practices of MTA, including the MTA's advertising standards ("Advertising Standards").  Defendant Prendergast was one of the final decision makers responsible for rejecting the Hamas Killing Jews Advertisement.  (Geller Decl. ¶ 9).

Defendant Jeffrey B. Rosen, is, and was at all relevant times, the Director of Real Estate for the MTA.  In that capacity, Defendant Rosen is responsible for enforcing the policies and practices of the MTA, including the MTA's Advertising Standards.  Defendant Rosen was one of the final decision makers responsible for rejecting the Hamas Killing Jews Advertisement.  (Geller Decl. ¶¶ 10).

The MTA, through its advertising agent, CBS Outdoor Americas Inc. (a/k/a CBS Outdoor) (hereinafter "CBS Outdoor"), leases space on its vehicles and transportation stations for use as advertising space.  (Geller Decl. ¶ 11).

The MTA accepts commercial and noncommercial public-service, public-issue, political-issue, and religious-issue advertisements, including controversial advertisements addressing these issues, for display on its advertising space.  (Geller Decl. ¶ 12).

---

[1] As a New York City governmental agency, MTA is mandated to comply with the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.  *See N.Y. Magazine v. Metro. Transp. Auth.*, 136 F.3d 123, 128 (2d Cir. 1998).

Accordingly, the MTA permits, as a matter of policy and practice, a wide variety of commercial, noncommercial, public-service, public-issue, political-issue, and religious-issue advertisements on its advertising space (hereinafter "Free Speech Policy"). (Geller Decl. ¶ 12). For example, the MTA has recently displayed on its buses the following advertisements conveying a message and viewpoint on the following public-issues:









(Geller Decl. ¶ 13).

Pursuant to Defendants' Free Speech Policy, over a period of several weeks during the months of July and August 2014, Plaintiffs negotiated with CBS Outdoor for the placement of several AFDI advertisements for display on the external advertising panels of MTA buses. On

August 25, 2014, CBS Outdoor representative, Howard Marcus, emailed Plaintiff Geller and informed her that the MTA agreed to display three of the four advertisements Plaintiffs had submitted for approval.  The Marcus email, however, informed Plaintiffs that the MTA had rejected the Hamas Killing Jews Advertisement on the grounds that "it is reasonably foreseeable that, due to material contained in it, its display would imminently incite or provoke violence or other immediate breach of the peace and so harm, disrupt, or interfere with safe, efficient, and orderly transportation operations."  (Geller Decl. ¶¶ 14-16, Ex. 1).

The censored Hamas Killing Jews Advertisement states, in relevant part, the following: "'Killing Jews is Worship that draws us close to Allah.' – Hamas TV.  That's His Jihad.  *What's yours*?"  The Hamas Killing Jews Advertisement appears as follows:



(Geller Decl. ¶¶ 17-18, Ex. 2).

The message of the Hamas Killing Jews Advertisement is timely in light of the ongoing terrorism conducted by Hamas operatives against Israeli civilians in the name of Islamic jihad. Moreover, the Israel / Palestinian conflict has recently drawn intense international media attention as Hamas regularly uses human shields (mostly women and children) to protect its rockets from Israel's defense forces while the Islamic terrorist organization continues its deadly attacks against Jews in Israel.  (Geller Decl. ¶ 19).

Plaintiffs have displayed the Hamas Killing Jews Advertisement in other major cities throughout the United States, including Chicago and San Francisco, and there have been no acts

of violence or other lawlessness caused by or attributed to the advertisement.  Indeed, Plaintiffs have never engaged in violence or lawlessness nor do they intend others to do so by displaying the Hamas Killing Jews Advertisement, as evidence by the advertisement itself.  (Geller Decl. ¶ 20).

The Hamas Killing Jews Advertisement includes a quote from Hamas MTV along with commentary from Plaintiffs—the sponsors of the advertisement as depicted on the advertisement itself—that counters the claims made in a national campaign on websites (*e.g.*, http://myjihad.org/), in articles and opeds, and on transit authority advertising space (*e.g.*, http://myjihad.org/2012/12/photo-gallery/) by the Council on American-Islamic Relations (CAIR) and other Muslim Brotherhood organizations and sympathizers in the United States promoting the message that jihad is simply a form of non-violent, spiritual introspection for Muslims.  Indeed, Plaintiffs' passive advertisement, as evidenced from within its four corners, does not advocate for the use of force or of law violation, is not directed to inciting or producing imminent lawless action, and, as the undisputed facts demonstrate, is not likely to incite or produce such action.  (Geller Decl. ¶ 21).

As noted above, this very same advertisement (Hamas Killing Jews Advertisement) ran on public transit authority advertising space in Chicago and San Francisco without incident.  Specifically, The Hamas Killing Jews Advertisement ran in Chicago for approximately one month beginning on February 22, 2013, and similarly for approximately one month in San Francisco beginning on March 11, 2013.  No physical disturbance, violence, or even vandalism was reported by transit or city authorities resulting from those displays.  The CAIR "MyJihad" advertisements referenced in the MTA Security Assessment (see below) also ran in Chicago and San Francisco for approximately one month, but several months earlier than the Hamas Killing Jews Advertisements in those cities.  (Geller Decl. ¶ 22).

- 7 -

On September 22, 2014, Defendants formally rejected the Hamas Killing Jews Advertisement in a final written determination.   In an email from Kenneth S. Pober, General Manager of CBS Outdoor, to David Yerushalmi, counsel for Plaintiffs, Mr. Pober appended a formal written rejection of the Hamas Killing Jews Advertisement authored by Defendant Rosen ("MTA Final Determination").

The MTA Final Determination reads in relevant part:

Dear Mr. Yerushalmi:

CBS Outdoor Group Inc. (CBS) has forwarded to me your demand for a formal determination concerning an advertisement that your client, American Freedom Defense Initiative (AFDI), submitted to it recently for display in September on New York City Transit Authority buses. . . .

Like CBS, the MTA initially concluded in mid-August that this "Killing Jews" ad in its current form—and AFDI has refused CBS's invitation to consider revising its proposed ad—does not conform to the MTA's advertising standards, specifically Section (a)(x), which addresses proposed advertisements that might incite or provoke violence.  Having now fully considered your two emails of August 29 and September 8, 2014, which CBS forwarded, the MTA continues to believe that it is reasonably foreseeable that the display of the "Killing Jews" ad in its current form at this time would "imminently incite or provoke violence or other immediate breach of the peace, and so harm, disrupt, or interfere with safe, efficient, and orderly transportation operations."   Accordingly, we are unwilling to allow its display on New York City Transit buses.

***

Following procedures adopted by the MTA to implement this standard, Ray Diaz, the MTA's Director of Safety and Security, undertook a security assessment of AFDI's four proposed ads.  Three of the ads he concluded did not advocate violence and thus did not risk inciting or provoking violence, and those ads are expected to run later this month (along with the three additional ads proposed by AFDI in the meantime).

Diaz concluded, however, that, since most reasonable observers would interpret the "Killing Jews" ad as urging direct, violent attacks on Jews, it was reasonably foreseeable, especially given the current turmoil in the Middle East, most especially in Gaza and Syria and Iraq, and the heightened security concerns in New York City, that its display now would "imminently incite or provoke violence or other

- 8 -

immediate breach of the peace, and so harm, disrupt, or interfere with safe, efficient, and orderly transportation operations."

The MTA recognizes that the "Killing Jews" ad was part of a series of AFDI ads that parodied other ads sponsored by the Council on American-Islamic Relations (CAIR) that had been displayed on buses in other cities, including Chicago and San Francisco.  Those ads—part of what CAIR called its "MyJihad" ads—were intended to show, according to CAIR, that jihad is a concept of individual and personal struggle, rather than violent conflict or terrorism. AFDI's parody ads were intended to refute CAIR's "MyJihad" ads by showing, according to AFDI's Executive Director, Pamela Geller, "how jihadists use the texts and teachings of Islam to justify violence and supremacism."

But the CAIR "MyJihad" ads have never run in New York City.  Without that crucial context, most people who saw AFDI's "Killing Jews" ad on a New York City Transit bus would not interpret it as a parody of CAIR's "MyJihad" ads, and not to be taken at face value.  Instead, most reasonable New Yorkers would interpret the "Killing Jews" ad as urging Muslims to kill Jews as a matter of religious obligation.  Although the required disclaimer would identify the ad's sponsor as AFDI, not Hamas, that is likely insufficient, by itself, to alert observers that the "Killing Jews" ad and its command to kill Jews should not be taken at face value, given AFDI's obscurity and its vague name. . . .

***

Very truly yours,

Jeffrey B. Rosen
Director, Real Estate

(Geller Decl. ¶¶ 23-24, Ex. 3).  The full text of the relevant MTA Advertising Standard § (a)(x) is as follows:

The advertisement, or any information contained in it, is directly adverse to the commercial or administrative interests of the MTA or is harmful to the morale of MTA employees or contains material the display of which the MTA reasonably foresees would incite or provoke violence or other immediate breach of the peace, and so harm, disrupt, or interfere with safe, efficient, and orderly transit operations.

(Geller Decl. ¶ 25, Ex. 4).

Notwithstanding the MTA's fear of violent Muslims who would likely be incited to imminent violence from the appearance of the Hamas Killing Jews Advertisement, the MTA issued a press release with a large image of the Hamas Killing Jews Advertisement in an apparent

- 9 -

effort to get out in front of the story and provide the public with its rationale for the rejection of the AFDI advertisement ("MTA Press Release").   Despite its security assessment, the MTA apparently felt sufficiently confident that all of the press outlets that might respond to the press release and publish a story with a picture of the Hamas Killing Jews Advertisement would do so with just the right amount of context to inhibit the jihadi impulses lurking in New York City, lest the MTA and the press be guilty of the same incitement conjured up by the MTA Security Assessment.  (Geller Decl. ¶ 26, Ex. 5 [MTA Security Assessment; ¶ 27, Ex. 6 [press release]).

The Hamas Killing Jews Advertisement is based upon a long public history of Hamas calling for the murder of Jews in Israel as worship.  One such call for the murder of Jews is available on YouTube at https://www.youtube.com/watch?v=i9jGsrQI5dw.   (Geller Decl. ¶ 28,).

Defendants' rejection of the Hamas Killing Jews Advertisement has caused and will continue to cause irreparable harm to Plaintiffs.  (Geller Decl. ¶ 29).

## ARGUMENT

### I.       Standard for Issuing a Preliminary Injunction.

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Metro. Taxicab Bd. of Trade v. City of N.Y.*, 615 F.3d 152, 156 (2d Cir. 2010) ("In order to justify a preliminary injunction, a movant must demonstrate 1) irreparable harm absent injunctive relief; 2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor."); *see also Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 880 F. Supp. 2d 456, 465 (S.D.N.Y. 2012)

("*AFDI v. MTA I*") (noting that a mandatory preliminary injunction requires a "clear showing that the moving party is entitled to the relief requested").

Additionally, because the requested injunction seeks to protect Plaintiffs' First Amendment right to freedom of speech, the crucial and often dispositive factor is whether Plaintiffs are likely to prevail on the merits. *See N.Y. Magazine v. Metro. Transp. Auth.*, 136 F.3d 123, 127 (2d Cir. 1998); *see also Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012) ("In the First Amendment context, the likelihood of success on the merits is the linchpin of the preliminary injunction analysis."); *see generally AT&T v. Winback & Conserve Program*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994) ("As a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff.").

## II.     Plaintiffs Are Likely to Succeed on the Merits of Their First Amendment Challenge to the MTA's Prior Restraint on Their Speech.

Plaintiffs' First Amendment claim is reviewed in essentially three steps. First, the court must determine whether the speech in question—Plaintiffs' advertisement—is protected speech. Second, the court must conduct a forum analysis as to the forum in question to determine the proper constitutional standard to apply. And third, the court must then determine whether MTA's speech restriction comports with the applicable standard. *AFDI v. MTA I*, 880 F. Supp. 2d at 466 (analyzing a free speech claim in "three parts").

Moreover, the MTA's refusal to accept Plaintiffs' advertisement for display, "which it took pursuant to regulations, [is] an exercise of a prior restraint." *N.Y. Magazine*, 136 F.3d at 131. Further, "[a]ny system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963) (collecting cases); *see also Lebron v. Wash. Metro. Area Transit Auth.*, 749 F.2d 893, 896 (D.C. Cir. 1984) (Bork, J.) (stating that the transit authority "carries a heavy burden of showing

- 11 -

justification for the imposition of [a prior] restraint") (internal quotation marks and citation omitted).

**A.       Plaintiffs' Advertisement Is Protected Speech.**

The first question is easily answered.  Plaintiffs' advertisement comes within the ambit of speech fully protected by the First Amendment.  *N.Y. Magazine*, 136 F.3d at 130 (2d Cir. 1998).

Moreover, "speech on public issues," such as Plaintiffs' timely advertisement addressing Hamas's jihad against Jews, "occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (quoting *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886. 913 (1982); *Carey v. Brown*, 447 U.S. 455, 467 (1980)); *see also AFDI v. MTA I*, 880 F. Supp. 2d at 466 ("As a threshold matter, the Court notes that the AFDI Ad is not only protected speech—it is core political speech.  The Ad expresses AFDI's pro-Israel perspective on the Israel/Palestinian conflict in the Middle East, and implicitly calls for a pro-Israel U.S. foreign policy with regard to that conflict. . . .  As such, the AFDI Ad is afforded the highest level of protection under the First Amendment.").

**B.       The MTA Created a Public Forum for Plaintiffs' Speech.**

"The [Supreme] Court has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for [expressive] purposes." *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 800 (1985).  Forum analysis has traditionally divided government property into three categories: traditional public forums, designated public forums, and nonpublic forums. *Cornelius,* 473 U.S. at 800; *N.Y. Magazine*, 136 F.3d at 128 ("The Supreme Court has created three categories of government property, and announced standards for reviewing government restriction of speech according to those categories.").  Once the forum is identified, the court must then determine whether the speech restriction is justified by the requisite standard. *Id.*

- 12 -

On one end of the spectrum lies the traditional public forum.  Traditional public forums, such as streets, sidewalks, and parks, are places that "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions."  *Hague v. CIO*, 307 U.S. 496, 515 (1939).  This forum is not at issue.

Next on the spectrum is the designated public forum, which exists when the government intentionally opens its property for expressive activity.  *Perry Educ. Ass'n v. Perry Local Educators*, 460 U.S. 37, 44 (1983).  "[A] public forum may be created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects."  *Cornelius*, 473 U.S. at 802; *N.Y. Magazine*, 136 F.3d at 128 (describing a designated public forum as "a place the government has opened for use by the public for expressive activity").

In a traditional or designated public forum, restrictions on speech are subject to strict scrutiny.  *Cornelius*, 473 U.S. at 800.  Thus, "speakers can be excluded from a public forum only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest. . . .  Similarly, when the government has intentionally designated a place or means of communication as a public forum speakers cannot be excluded without a compelling government interest."  *Id*.; *N.Y. Magazine,* 136 F.3d at 128 ("In both traditional public fora and designated public fora, content-based regulations survive only if narrowly drawn to achieve a compelling [governmental] interest.") (internal quotation marks omitted).

At the opposite end of the spectrum is the nonpublic forum.  The nonpublic forum is "[p]ublic property which is not by tradition or designation a forum for public communication."  *Perry Educ. Ass'n,* 460 U.S. at 46.  In a nonpublic forum, the government "may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the

speaker's view." *Id*. Thus, even in a nonpublic forum, a speech restriction must be reasonable and viewpoint neutral to pass constitutional muster. *Id*.; *N.Y. Magazine,* 136 F.3d at 128 ("The government may limit speech in a non-public forum if the limitation is reasonable, and not based on the speaker's viewpoint.").

To resolve the forum question, courts "look[] to the policy and practice of the government" as well as "the nature of the property and its compatibility with expressive activity." *Cornelius*, 473 U.S. at 802; *see generally Lehman v. City of Shaker Heights,* 418 U.S. 298 (1974). "In determining the government's intent for a forum, the Court has examined not only the characteristics of the forum, but also the policies by which it governed the use of the forum." *N.Y. Magazine*, 136 F.3d at 129); *see also Grace Bible Fellowship, Inc. v. Maine Sch. Admin. Dist. No. 5*, 941 F.2d 45, 47 (1st Cir. 1991) (stating that "actual practice speaks louder than words" when conducting a forum analysis)

Here, the MTA's advertising space on its buses, subways, and other public properties is properly characterized as a designated public forum. *N.Y. Magazine*, 136 F.3d at 128-30; *AFDI v. MTA I*, 880 F. Supp. 2d at 472 (S.D.N.Y. 2012) (explaining that *N.Y. Magazine* was controlling on the forum question and concluding that the MTA's advertising space is a designated public forum). Plaintiffs do not understand Defendants to oppose this characterization—and for good reason. Since *N.Y. Magazine* and as recent as two years ago in *AFDI v. MTA I,* the Second Circuit and this Court, respectively, have concluded definitively that MTA's transit advertising spaces were designated public fora based upon the permitted expressive activities and MTA's regulatory (as opposed to commercial) posture. Indeed, if anything, the MTA has expanded the First Amendment activities permitted on its advertising space, as the record demonstrates in this case. In sum, because the forum is wholly suitable for Plaintiffs' speech, it is a designated public forum for the display of Plaintiffs' advertisement. Therefore, the MTA must demonstrate a *compelling*

reason that is *narrowly tailored* to justify its prior restraint on Plaintiffs' speech—a burden that it cannot meet.

**C.    The MTA's Prior Restraint on Plaintiffs' Speech Cannot Survive Constitutional Scrutiny.**

**1.    The MTA's Speech Restriction Is Content Based.**

Content-based restrictions on speech in a public forum are subject to strict scrutiny. *Cornelius*, 473 U.S. at 800 ("Speakers can be excluded from a public forum only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest.").  "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger*, 515 U.S. 819, 828 (1995); *see also R.A.V. v. St. Paul*, 505 U.S. 377, 386-92 (1992) (holding that the government may not "impose special prohibitions on those speakers who express views on disfavored subjects" or on the basis of "hostility—or favoritism—towards the underlying message expressed").  Consequently, courts "apply the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994).  Thus, content-based restrictions "are presumptively unconstitutional." *AFDI v. MTA I*, 880 F. Supp. 2d at 474 (citing *R.A.V.*); *see also S.O.C., Inc. v. Cnty. of Clark*, 152 F.3d 1136, 1145 (9th Cir. 1998) (same).

To determine whether a restriction is content-based, the court looks at whether it "restrict(s) expression because of its message, its ideas, its subject matter, or its content." *Consol. Edison Co. of N.Y. v. Pub. Serv. Comm. of N.Y.*, 447 U.S. 530, 537 (1980).  Moreover, it is a clearly established principle of law that "[l]isteners' reaction to speech is not a content-neutral basis for regulation." *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 134 (1992).

- 15 -

Here, it is undisputed that the MTA rejected Plaintiffs' advertisement based on the content of the advertisement's message in clear violation of the First Amendment. *See Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*, 898 F. Supp. 2d 73, 80-83 (D.D.C. 2012) ("AFDI v. WMATA") (holding that WMATA's delay in running an advertisement based upon "security concerns" was an impermissible content-based restriction on speech).

We believe it is fair to summarize the analysis to this point by noting what is likely—or at least should be—three undisputed legal conclusions. First, Plaintiffs' advertisement constitutes public issue speech (*i.e.*, a criticism or parody of the notion that jihad should be understood as a noble and peaceful endeavor in the face of a global jihad inflicting murderous results, with a specific emphasis on Hamas's jihad against Jews). As such, it is "afforded the highest level of protection under the First Amendment." *AFDI v. MTA I*, 880 F. Supp. 2d at 466. Second, the MTA's advertising space is a designated public forum such that content-based restrictions must satisfy strict scrutiny. Third, the MTA's censorship based upon how some theoretical group might react to its message is a content-based prior restraint.

Defendants appear to understand these three points. Their argument, however, is that some members of the New York viewing public will misinterpret the advertisement as a call to murder Jews and immediately rise up and react violently. Specifically, Defendant Rosen explained the MTA's position thusly: "MTA's concern is that AFDI's 'Killing Jews' ad will be interpreted as urging attacks on Jews ***and thus will incite or provoke such attacks***, not that it will be interpreted as criticizing Hamas or Jihad or Islam and thus draw objections from those who disagree." (Geller Decl. ¶ 24, Ex. 3,) (emphasis added). If we understand this vaguely articulated security threat at face value, Defendants are claiming that certain Muslims will interpret the advertisement as advocating the imminent murder of Jews ***and*** that some subset of these Muslims will likely and

- 16 -

imminently seek out Jews to murder.  In other words, Defendants are asserting that both the Advertising Standard § (a)(x) facially and as applied in this case protect against imminent violent acts.

This understanding of Defendants' position is, in reality, a claim that Plaintiffs' speech falls within one of the traditional exceptions to content-based restrictions, typically referred to as incitement.  *See Brandenburg v. Ohio*, 395 U.S. 444, 447-48 (1969); *see also United States v. Alvarez*, 132 S. Ct. 2537, 2544 (2012) ("In light of the substantial and expansive threats to free expression posed by content-based restrictions, this Court has rejected as 'startling and dangerous' a 'free-floating test for First Amendment coverage . . . [based on] an *ad hoc* balancing of relative social costs and benefits.'  Instead, content-based restrictions on speech have been permitted, as a general matter, only when confined to the few 'historic and traditional categories [of expression] long familiar to the bar' . . . .  Among these categories are advocacy intended, and likely, to incite imminent lawless action [citing *Brandenburg*].")  The problem with Defendants' claim that the MTA's content-based prior restraint is constitutionally permissible because some Muslims might misunderstand Plaintiffs' advertisement to be an "urging" to engage in imminent violence is that it is wrong as a matter of law and factually naked if not absurdly so.  As we noted at the outset, the legal errors and factual inadequacies undergirding Defendants' positions may be divided into four specific criticisms, and we treat each in turn below.

## 2. The MTA's Speech Restriction Is Unconstitutional Both Facially and As Applied.

Before we examine more closely the constitutional infirmities of the relevant MTA Advertising Standard at issue here, we pause to understand what the incitement exception actually requires.  Under *Brandenburg* and the Second Circuit's clear rulings post-*Brandenburg*, to apply a content-based speech restriction based upon a claim of incitement, the MTA must be able to

- 17 -

show (1) that the given speaker *directed* her speech to incite *imminent* lawless acts and (2) that the speech was *likely* to lead to *imminent* lawlessness. *Brandenburg v. Ohio*, 395 U.S. at 447-48; *United States v. Rowlee*, 899 F.2d 1275, 1280 (2nd Cir. 1990) (quoting *United States v. Freeman*, 761 F.2d 549, 552 (9th Cir. 1985))[2]; *United States v. Rahman*, 189 F.2d 88, 115 (2nd Cir. 1998) (describing *Brandenburg*'s holding as "a state may proscribe subversive advocacy only when such advocacy is directed towards, and is likely to result in, 'imminent lawless action'"); *Melzer v. Bd. of Educ.*, 336 F.3d 185, 198 (2d Cir. 2003)     (stating that "advocacy [must be] directed to inciting or producing imminent lawless action and is likely to incite or produce such action").

### a.  The MTA's Advertising Standard Facially and as Applied Ignores *Brandenburg*'s Intentionality Requirement.

The MTA's Advertising Standard § (a)(x) ignores entirely *Brandenburg*'s requirement of intentionality to incite imminent and likely violence.  As such, the Advertising Standard is facially unconstitutional.  Presumably, it would be possible for the MTA to "read into" the Advertising Standards such a requirement and to apply it as such in practice.  The MTA, however, has done just the opposite.  Rather than focusing, as the First Amendment requires, on the speaker's intentions, the MTA has granted any would-be or wanna-be jihadist with a heckler's veto by allowing the lawbreaker's understanding of the advertisement to redirect the speaker's words to be a call for imminent lawless action.  Unfortunately for the MTA, and fortunately for those who cherish freedom of speech, this is not the law.  *See, e.g., Forsyth Cnty.*, 505 U.S. at 134; *Feiner,*

---

[2] In *Freeman*, then Judge (now Justice) Kennedy stated that "the jury should have been charged that the expression was protected unless both the ***intent of the speaker*** and the tendency of his words was to produce or incite an imminent lawless act."  *Freeman,* 761 F.2d at 552.

340 U.S. at 320; *Locurto*, 447 F.3d at 179; *Hedges*, 9 F.3d at 1299; *Lewis*, 253 F.3d at 1082 ("The First Amendment knows no heckler's veto.").

This point is illustrated by the Second Circuit's decision in *Melzer*. Melzer was a self-proclaimed homosexual pedophile, a member of a national pedophile association known by its acronym NAMBA, editor of NAMBA's "Bulletin," and author of Bulletin articles relevant to pedophiles and their efforts to avoid detection. When the school board discovered Melzer's association with NAMBA, it terminated him. *Melzer*, 336 F.3d at 188-92. As to the First Amendment's protection under *Brandenburg*, the Second Circuit was clear. Even though the Bulletin that Melzer edited, and to which he contributed his own articles, could be read as an "instruction manual" for illegally molesting children and could "reasonably be assumed to have led to . . . abuse[,]" "[u]nder our system an individual cannot be punished for . . . engaging in advocacy, absent a clear showing . . . that the . . . the advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." In the case at bar, where in the advertisement is there even an advocacy, much less an urging, for imminent violence or lawlessness? Nowhere does the MTA explain this void except to conclude arbitrarily that because there was no context in New York, the virtual jihadist would not properly understand the advertisement as criticism or parody. But even assuming the MTA's virtual jihadists lacked the contextual milieu, how does that in and of itself convert the plain language of the advertisement into a ***direction*** to engage in lawless behavior? If publishing a veritable "instruction manual" for pedophiles that one may reasonably assume has led to abuse is not incitement, but permissible advocacy, how does the MTA explain its view of the law? We doubt a satisfactory explanation will be forthcoming because the MTA is wrong about the law and its misplaced focus on the jihadist's understanding of the advertisement's sponsor's intent.

### b.   <u>The MTA's Rationale Is Not Based on Actual Facts</u>.

While the MTA would no doubt like the Court to take its security expert's word on the threat of impending violence as gospel, as we have noted, when engaging in a prior restraint of speech, especially speech on a public issue, the MTA carries a heavy burden to present a factual basis for its restriction.   Yet, we are presented with <u>no</u> facts demonstrating that the prospective jihadists in New York would not only understand the advertisement to be a call to immediate arms, but also be so motivated as to take up those arms imminently.   *See, e.g.*, *Melzer*, 336 F.3d at 198 ("Because we assume that Melzer's First Amendment activity possesses the highest value, it therefore places a heavy burden on the Board to justify dismissal.").

Indeed, the Second Circuit has explained and underscored the trial court's role in examining a government agency's rationale for entirely permissible time-place-manner restrictions, which only need be reasonable (*i.e.*, not subject to strict scrutiny, as in this case), as follows:

> A court's power to review government restrictions imposed on the exercise of a First Amendment right occupies middle ground between extremes.   It does not kowtow without question to agency expertise, nor does it dispense justice according to notions of individual expediency "like a kadi under a tree."[3]   *Terminiello v.*

---

[3] The quote from Justice Frankfurter's opinion in *Terminiello*, oft quoted by lower courts, references an Islamic judge (typically spelled as *qadi*).   The context of the quote is the fact that Islamic law (*i.e.*, Sharia) does not permit precedent to bind a judge.   Each ruling, even by the same judge, is independent of all previous rulings.   *See, e.g., Nat'l Grp. for Communs. & Computers Ltd. v. Lucent Techs. Int'l Inc*., 331 F. Supp. 2d 290, 295 (D.N.J. 2004) ("When a Saudi Arabian judge, known as a 'qadi,' attempts to resolve disputes, his decision must be in accordance with the Shari'a.   Therefore, he will turn to the aforementioned Qur'an, the Sunnah, and fiqh to guide his legal determination.   Saudi Arabian judges are not bound by judicial precedent (in fact, Saudi Arabian judicial opinions are not published) and the concept of *stare decisis* does not exist.") (parenthetical in the original) (citations to the record omitted).

- 20 -

*Chicago*, 337 U.S. 1, 11, 93 L. Ed. 1131, 69 S. Ct. 894 (1949) (Frankfurter, J., dissenting).  "Because the excuses offered for refusing to permit the fullest scope of free speech are often disguised, a court must carefully sort through the reasons offered to see if they are genuine."  *Olivieri v. Ward*, 766 F.2d 690, 691 (2d Cir. 1985).  The district court performed that sorting process by means of the full trial that it conducted and the thorough opinion it handed down.

When First Amendment concerns are involved a court "'may not simply assume that [a decision by local officials] will always advance the asserted state interests sufficiently to justify its abridgement of expressive activity.'"  *City of Los Angeles v. Preferred Communications, Inc.*, 476 U.S. 488, 90 L. Ed. 2d 480, 106 S. Ct. 2034, 54 U.S.L.W. 4542, 4544 (1986) (quoting with approval *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 803 n.22, 80 L. Ed. 2d 772, 104 S. Ct. 2118 (1984)).  When reviewing the reasonableness of time, place and manner restrictions on First Amendment rights, a court must independently determine the rationality of the government interest implicated and whether the restrictions imposed are narrowly drawn to further that interest.  In the instant case, we agree with the district court that the restrictions imposed were not drawn solely to further the government's conceded interest in public safety.

*Olivieri v. Ward*, 801 F.2d 602, 606 (2d Cir. 1986).  Given the trial court's role in examining a government agency's reasonable time-place-manner restriction, *a fortiori* this Court must play an active and probing role in testing any underlying factual assertions by the MTA in order to determine whether its content-based restriction passes strict scrutiny.  Juxtaposing the MTA's pure conjecture about the effect of "context" with the *Melzer* court's intensive review of the facts evidencing actual school disturbances to test if the school board had met its "heavy burden" to justify Melzer's termination, *Melzer*, 336 F.3d at 198-200, demonstrates the MTA's failure to carry its strict scrutiny burden in this case.

### c.  The MTA's Security Assessment Contradicts the Known Facts.

The MTA's security assessment contradicts the actual facts—the Hamas Killing Jews Advertisement has run without incident over long periods of time in Chicago and San Francisco.  The MTA's answer to this quandary is the preposterous and rather insulting claim that otherwise violent Muslims in Chicago and San Francisco did not rise up to murder Jews when they saw

Plaintiffs' advertisement because they would have recalled the CAIR "MyJihad" advertisement and immediately understood the context and remained calm and peaceful.  But even if these potentially violent jihadists had understood the parodic context, why would they have understood Hamas's well-known call for devout Muslims to murder Jews any differently than their counterparts in New York?  Parody or criticism does not blind the putative jihadist from responding to a perceived fatwa to murder Jews—certainly one as infamous and effective as Hamas's.  Moreover, the claim of context in Chicago and San Francisco would just as likely have worked in the opposite direction—the MTA's Muslim who understands jihad to be violent and appropriately conducted in the streets of New York, Chicago, or San Francisco would have understood Plaintiffs' advertisement as a true and proper response to the westernized and watered-down telling of jihad.  Would not the incitement factor be even greater with the context of a previously false claim that jihad does not include murdering Jews—if only to prove the former false and the latter true?

Lacking facts of an actual threat posed by the display of Plaintiffs' advertisement, and tied to a narrative predicated upon assumptions stacked upon assumptions defying commonsense, and which, at the end of the day, contradict the known fact that the advertisement has run without incident in other major cities, the MTA remains obdurate.  Defendants, as the guardians of the public forum for free speech they designated and maintain, take the untenable position that the least restrictive means to counter the phantom threat of our rather malleable, yet violent virtual jihadist, is to censor Plaintiffs' speech highlighting Hamas's theological nexus between murdering Jews and Islamic worship.  The MTA's "all-or-nothing" approach leads us to the final constitutional infirmity of the Advertising Standards as applied in this case.

**d.  The MTA's Censorship Is the Most Restrictive, Not the Least.**

MTA's content-based censorship must satisfy strict scrutiny, identifying the compelling state interest and choosing the least restrictive measure to achieve that end.  While security for riders on MTA's transit system is a compelling interest, that interest has nothing to do with Plaintiffs' advertisement unless Defendants can carry their "heavy burden" and show that safety and security would be at risk if Plaintiffs' advertisement is displayed.  As we've shown above, the MTA has failed to make this showing and to meet it burden.  But even assuming *arguendo* that it would be *likely* that some jihadist living in the midst of peaceful New Yorkers would take the Hamas Killing Jews Advertisement as a kind of fatwa to attack and murder Jews, and assuming *arguendo* that this virtual jihadist would act *imminently*, the MTA could have chosen any number of less restrictive alternatives other than total censorship.  *AFDI v. MTA I*, 880 F. Supp. 2d at 477 ("[I]t is well-settled that, where a violation of the First Amendment is concerned, the government's benign, even noble, intentions are no cure.  *See Texas v. Johnson*, 491 U.S. 397, 418, 109 S. Ct. 2533, 105 L. Ed. 2d 342 (1989) (invalidating prohibition on desecrating American flag and explaining that "[i]t is not the State's ends, but its means, to which we object").

Because the MTA's "threat assessment" rests entirely on the assumption that the potentially violent jihadists in Chicago and San Francisco remained peaceful because they recognized the parodic context, a simple and more effective violence damper than even a CAIR "MyJihad" ad running a month earlier would be for the MTA to run its own message nearby Plaintiffs' advertisements contemporaneously.  *See AFDI v. WMATA*, 898 F. Supp. 2d at 83 (confronting a far more documented security threat, WMATA postponed AFDI's ad, leading the court to conclude that WMATA's restriction was not the least restrictive because it "could have decided to distance itself from Plaintiffs' sentiments with accompanying statements and/or

- 23 -

advertisements which conveyed its disagreement and explained its constitutional obligations") In fact, this was precisely the tact chosen by the San Francisco transit authority when it realized AFDI's advertisements were fully protected by the First Amendment. (Geller Decl. ¶ 23,) (explaining that the San Francisco transit authority ran its own counter statements adjacent to AFDI's ads).

### III.   Plaintiffs Will Suffer Irreparable Harm in the Absence of Injunctive Relief.

The proof of irreparable harm suffered by Plaintiffs is clear and convincing. It is well established that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Swartzwelder v. McNeilly*, 297 F.3d 228, 241 (3d Cir. 2002) (same); *Newsom v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989) ("The Supreme Court has unequivocally admonished that even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief.") (citing *Elrod*). The Second Circuit has explained this issue dispositively:

> As for irreparable harm, the district court noted that if New York Magazine were correct as a matter of law that MTA's action unlawfully abridged its freedom of speech as guaranteed by the First Amendment, New York Magazine established irreparable harm. The "'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Deeper Life Christian Fellowship, Inc. v. Board of Educ.*, 852 F.2d 676, 679 (2d Cir. 1988) (quoting *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 2689, 49 L. Ed. 2d 547 (1976)). As the district court correctly found that the facts presented constitute a violation of New York Magazine's First Amendment freedoms, New York Magazine established *a fortiori* both irreparable injury and a substantial likelihood of success on the merits.

*N.Y. Magazine*, 136 F.3d at 127.

### IV.   The Balance of Equities Tips Sharply in Favor of Granting the Injunction.

The likelihood of harm to Plaintiffs without the injunction is substantial because the deprivation of First Amendment rights, even for minimal periods, constitutes irreparable injury.

(*See supra* § III).  On the other hand, if the MTA is enjoined from enforcing its prior restraint on Plaintiffs' speech, it will suffer no harm because the exercise of constitutionally protected rights can never harm any of the MTA's legitimate interests.  Moreover, the fact that the Hamas Killing Jews Advertisement has run without incident on the transit authority advertising space in other major cities demonstrates that any concerns of disruption by the MTA are unfounded.

## V.    Granting the Injunction Is in the Public Interest.

Courts considering requests for preliminary injunctions have consistently recognized that the public interest is best served by upholding First Amendment freedoms.  *See Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 889 F. Supp. 2d 606, 615 (S.D.N.Y. 2012) (entering a permanent injunction immediately following *AFDI v. MTA I* and noting that "the public as a whole has a significant interest in . . . protection of First Amendment liberties") (internal quotations and citation omitted); *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[E]nforcement of an unconstitutional law is always contrary to the public interest.").  Thus, the public interest favors granting the requested injunction.

## CONCLUSION

For the foregoing reasons, this court should grant the motion and issue the requested injunction pursuant to Federal Rules of Civil Procedure 65..

Respectfully submitted,

**AMERICAN FREEDOM LAW CENTER**

*/s/ David Yerushalmi*
David Yerushalmi, Esq.* (DC # 978179)
1901 Pennsylvania Avenue NW, Suite 201
Washington, D.C. 20006
Tel: (646) 262-0500; Fax: (801) 760-3901

Robert Joseph Muise, Esq.* (MI P62849)
P.O. Box 131098
Ann Arbor, Michigan 48113
Tel: (734) 635-3756; Fax: (801) 760-3901

*Subject to admission *pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that on November 28, 2014, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.  I further certify that a copy of the foregoing has been served by ordinary U.S. mail upon all parties for whom counsel has not yet entered an appearance electronically: none.

**AMERICAN FREEDOM LAW CENTER**

*/s/ David Yerushalmi*
David Yerushalmi, Esq.