UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
─────────────────────────────────────

AMERICAN FREEDOM DEFENSE INITIATIVE,
ET AL.,

                Plaintiffs,

      - against -

METROPOLITAN TRANSPORTATION
AUTHORITY, ET AL.,

              Defendants.
─────────────────────────────────────

14 Cv. 7928 (JGK)

OPINION AND ORDER

JOHN G. KOELTL, District Judge:

    The plaintiffs, a pro-Israel advocacy organization known for its public criticism of Islam, and its co-founders, submitted a political advertisement to the Metropolitan Transportation Authority ("MTA") to be displayed on the backs of MTA buses.  The advertisement portrayed a menacing-looking man whose head and face are mostly covered by a head scarf.  The ad includes a quote from "Hamas MTV": "Killing Jews is Worship that draws us close to Allah."  Underneath the quote, the ad stated: "That's His Jihad. *What's yours?*"  The bottom of the ad included a disclaimer that it was sponsored by the plaintiff organization, the American Freedom Defense Initiative ("AFDI"), and did not imply the MTA's endorsement of the views expressed by the ad.

    Although the MTA accepted other controversial advertisements submitted by the plaintiffs, it refused to run

this advertisement, which the parties both term the "Killing Jews" advertisement.  In doing so, the MTA cited its standards prohibiting advertisements that would incite or provoke violence.  The plaintiffs promptly sued, alleging that the MTA's refusal to run the advertisement on its buses infringed on the plaintiffs' First Amendment rights.  The plaintiffs moved for a preliminary injunction that would order the defendants to display the ad.  The Court held an evidentiary hearing on the preliminary injunction motion on March 24, 2015.

While the Court is sensitive to the MTA's security concerns, the defendants have not presented any objective evidence that the Killing Jews advertisement would be likely to incite imminent violence.  Indeed, as the defendants knew when considering whether to run the ad, substantially the same advertisement ran in San Francisco and Chicago in 2013 without incident.  The advertisement qualifies as protected speech, and the defendants have restricted it based on its content without a compelling interest or a response narrowly tailored to achieving any such interest.  Accordingly, the plaintiffs' motion for a preliminary injunction is **granted.**

The Court makes the following findings of fact and reaches the following conclusions of law pursuant to Federal Rule of Civil Procedure 52.

**I.**

**A.**

The plaintiff AFDI is a nonprofit organization incorporated in New Hampshire.  The plaintiffs Pamela Geller and Robert Muse are the President and Vice President of AFDI, respectively.  The defendant MTA is a New York State public authority and public benefit corporation.  Together with its affiliated agencies, the MTA provides mass transportation services in the New York City metropolitan area.  Defendant Thomas F. Prendergast is the Chairman and Chief Executive Officer of the MTA, and defendant Jeffery B. Rosen is the Director of the MTA Real Estate Department.

AFDI purports to "act[] against the treason being committed by national, state, and local government officials . . . in their capitulation to the global jihad and Islamic supremacism." See Biography, http://freedomdefense.typepad.com/about.html (last visited Apr. 18, 2015) (AFDI-associated website referenced in Chicago and San Francisco Killing Jews advertisements).  In order to express its views publicly on issues regarding Israel and Islam, AFDI purchases advertising space on public transit authority property in major cities throughout the United States. Geller Decl. ¶¶ 4-6.

3

In order to obtain revenue, the MTA accepts advertisements to be displayed on its subway, commuter rail, and bus systems. Rosen Decl. ¶ 4.  The MTA accepts not only commercial advertisements, but also non-commercial advertisements by government agencies, nonprofit organizations, and religious groups, as well as political advertisements and public service messages.  Id. ¶ 10.  To facilitate the placement of these advertisements, the MTA enters into license agreements with independent outdoor advertising companies, including CBS Outdoor Group Inc. ("CBS Outdoor").  Id. ¶¶ 5, 8.  MTA and CBS Outdoor's license agreement covers advertisements on the exterior of MTA buses.  Id. ¶ 8.  Defendant Rosen oversees the MTA's advertising program as one of his responsibilities as Director of Real Estate.  Tr. 14-15.[1]

**B.**

In March 1994, the MTA first adopted standards governing the advertisements it would accept, and those standards were incorporated into its license agreements.  Rosen Decl. ¶ 12. The standards prohibited certain categories of advertisements, including, among others, false, misleading, or deceptive commercial advertisements, libelous advertisements, and

---

[1] All references to "Tr." refer to the transcript of the preliminary injunction hearing held on March 24, 2015.

advertisements including obscene material, as defined in the New York Penal Law.  Id. ¶ 14.  In September 1997, the MTA amended its standards to prohibit other categories of advertisements, including, among others, advertisements that demean an individual or group of individuals on account of several protected categories, including race and religion (the "no-demeaning standard").  Id. ¶¶ 20-21.

In 2011, the AFDI submitted an ad for display on MTA buses that stated, "In any war between the civilized man and the savage, support the civilized man.  Support Israel.  Defeat Jihad."  Id. ¶ 22 (the "Savages" ad).  The MTA refused to run the ad due to its belief that the "savages" reference demeaned Muslims or Palestinians, or both, and thus violated the MTA's no-demeaning standard.  Id. ¶ 23.  AFDI thereafter sued the MTA in this Court, alleging that the no-demeaning standard violated the First Amendment on its face.  Judge Engelmayer agreed, holding that the no-demeaning standard differentiated based on the content of the ad and only proscribed "specified disfavored topics."  Am. Freedom Def. Initiative v. Metro. Transp. Auth., 880 F. Supp. 2d 456, 475 (S.D.N.Y. 2012) (quoting R.A.V. v. City of St. Paul, 505 U.S. 377, 391 (1992)) (internal quotation marks omitted).  The Court therefore granted AFDI's motion for a

preliminary injunction enjoining the MTA from enforcing no-demeaning standard.  Id. at 478.

In September 2012, the MTA considered alternatives for remedying the constitutional defects identified by Judge Engelmayer, such as only permitting commercial advertising, but ultimately chose to continue accepting all forms of advertising and amended its standards to discontinue the no-demeaning standard.  Rosen Decl. ¶¶ 27-28.[2]  At around the same time, the MTA amended its standards to address more explicitly advertisements that it believed could incite or provoke violence.  Rosen Decl. ¶ 34.  Thus, in September 2012, MTA amended Section (a)(x) of its standards, adding language that precluded any advertisement that "contains material the display of which the MTA reasonably foresees would imminently incite or provoke violence or other immediate breach of the peace, and so harm, disrupt, or interfere with safe, efficient, and orderly transit operations."  Id. ¶ 35, Ex. 3 (MTA Advertising Standards).  Shortly thereafter, the then-Chairman of the MTA, Joseph Lhota, issued a memorandum describing the procedures for enforcement of Section (a)(x).  Id. ¶ 37, Ex. 4 (Lhota Memorandum).  The memorandum provided that if a contractor

---

[2] To mitigate its concerns with running potentially demeaning advertisements, the MTA also amended its standards to heighten the visibility of its disclaimers on advocacy ads.  Id. ¶ 31.

receives an advertisement that the contractor believes might not comply with Section (a)(x), the contractor should alert the MTA Director of Real Estate, who should promptly notify the MTA Director of Security.  Id. Ex. 4.  The Director of Security would then make an assessment of the ad's compliance with Section (a)(x), and notify the MTA Chairman of his determination.  Id.

### C.

During the summer of 2014, AFDI submitted several new advertisements to CBS Outdoor for display on MTA subway entrances and buses.  These included the above-mentioned "Savages" ad; an ad featuring a picture of Adolph Hitler sitting with the purported "leader of the Muslim World," next to the words, "Islamic Jew-Hatred: It's in the Quran," and a call for the end of U.S. aid to Islamic countries; an ad featuring a quote from Israeli Prime Minister Netanyahu criticizing Hamas and urging support for Israel; and the "Killing Jews" ad.  Rosen Decl. ¶¶ 77-84.  AFDI sought to display the Killing Jews ad on the tails of MTA buses in Manhattan.  Id. ¶ 83.  CBS Outdoor forwarded all of them to the MTA, and the MTA Security Director, Raymond Diaz, assessed their compliance with Section (a)(x).  On August 19, 2014, Diaz reported his findings in a letter to the MTA Chairman.  Diaz Decl. Ex. 1.  Diaz found that the first

7

three ads complied with Section (a)(x), and the MTA approved
those ads for display.  Id.; Rosen Decl. ¶¶ 86-87.  However,
Diaz concluded that the Killing Jews ad advocated violent
attacks on Jewish people, and that it was reasonably foreseeable
that the ad would incite or provoke violence in violation of
Section (a)(x).  Diaz Decl. ¶¶ 26-28.

AFDI intended the Killing Jews ad as a parodic response to
the "My Jihad" ad campaign carried out in 2012 and 2013 by the
Council on American-Islamic Relations ("CAIR"), a Muslim civil
rights advocacy organization.  Rosen Decl. ¶ 68; Geller Decl.
¶ 21.  CAIR initiated the "My Jihad" campaign in response to
AFDI's "Savages" ad.  Rosen Decl. ¶ 63.  The "My Jihad" campaign
sought to portray the Islamic concept of lesser jihad, or
individual and personal struggle, by depicting Muslim
individuals with positive messages.  Rosen Decl. ¶ 62.  One
typical ad states, "'#MyJihad is to build friendships across the
aisle.' *What's yours*?"  Rosen Decl. ¶ 60.  The CAIR ads ran in
public transit systems in Chicago and San Francisco in early
2013, but never ran in New York because of CAIR's disagreement
with the MTA over the MTA's insistence on the inclusion of its
disclaimer.  Rosen Decl. ¶ 65-68.  The AFDI, in turn, sought to
counter the CAIR ads with the Killing Jews ad, among others,
which all depict Islamic extremist quotes or acts of violence or

terrorism and then mimick, "That's #My Jihad. *What's yours*?"
Rosen Decl. ¶¶ 68-69.

Diaz was aware of the AFDI's intention at the time of his
security assessment and acknowledged it in his letter to the MTA
Chairman. Diaz Decl. Ex. 1. However, he wrote in the letter
that "what matters is not AFDI's intent, but how the ad would be
interpreted." Id. Diaz noted in the letter that the CAIR
campaign had not run in New York, and that New Yorkers would not
understand the Killing Jews ad as parody. Id. Diaz concluded
that the quote depicted from Hamas MTV, "Killing Jews is Worship
that draws us close to Allah," followed by "That's his Jihad.
*What's yours*?" would be interpreted as "urg[ing] Muslims to kill
or attack Jews as a religious obligation," and thus would be
likely to provoke violence. Id.

At the time Diaz made his security assessment, he was aware
that the Killing Jews ad had run on public buses in San
Francisco and Chicago in early 2013, and was not aware of any
acts of violence provoked by the display of the ads. Stipulated
Facts for Purposes of Pls.' Prelim. Inj. Mot. ¶ 3. Indeed, an
MTA employee working under Diaz's supervision had e-mailed an
employee of the San Francisco Municipal Transportation Agency
("SFMTA") with several questions about whether there were any
acts of violence or negative incidents arising from the display

of the ads.  Tr. 57.  The SFMTA employee simply responded "none" to each question.  Id.  Diaz also conferred with the New York Police Department ("NYPD"), which, according to Diaz, agreed that the advertisement promoted violence, but declined to offer an official opinion on the ad.  Diaz Decl. ¶ 29.  Rosen and Diaz both testified that they were not aware of any previous acts of violence that arose in connection with any ad displayed on MTA property.  Tr. 30, 61.  The only lawless acts that Diaz could point to were a small number of instances of vandalism, such as someone tearing down an advertisement or painting over it with graffiti.  Tr. 59-61.

At the hearing, Diaz explained his conclusion in more detail.  Diaz suggested that the ad's advocacy towards violence principally came from the line, "What is yours?", which he stated could be read as a "call to violence."  Tr. 82, 83, 87. Diaz testified that the likelihood of incitement was "hard to quantify" in percentages, Tr. 72, but that in the case of this ad, there are "easily radicalized" people committing violent acts "almost on a daily basis throughout the world," and that the ad could cause such people to act violently.  Tr. 75-76.  In his declaration, Diaz cited two examples of individuals who committed violent acts in New York City which, though unrelated to any MTA advertisement, were apparently motivated by radical

Islamic beliefs or hatred of Jewish people.  Diaz Decl. ¶ 31.
However, at one point in his testimony, Diaz suggested that even
if "nobody ever committed a violent act as a result of this ad
and we knew in the future that nobody was ever going to do
that," he still would have refused to run it because it
advocated violence.  Tr. 100.

In testifying about the distinctions between Chicago and
San Francisco, where the Killing Jews ad had previously run, and
New York, Diaz did not rely on the fact that the CAIR "My Jihad"
ads had not been displayed in New York, as he did in his letter
to the MTA Chairman.  In fact, Diaz testified that even if the
CAIR ads had run in New York, he still would have refused to run
the Killing Jews ad.  Tr. 77-78.  At one point, Diaz stated
that he found the Killing Jews ad in violation of Section (a)(x)
despite the lack of a violent response in the other cities
because the ad "clearly advocated violence."  Tr. 80.  He also
testified that the circumstances were different, because New
York City is the "prime terror target" among the three cities,
and that the "terrorist security threat" that faces New York
City has increased since early 2013, when the ads ran in Chicago
and San Francisco.  Tr. 106-07.

**D.**

Ultimately, MTA Chairman Prendergast concurred with Diaz's finding, Tr. 105-06, and on August 25, 2014, Rosen e-mailed the MTA's determinations about the Killing Jews ad to CBS Outdoor, which forwarded the e-mail to AFDI.  Rosen Decl. ¶¶ 87-91, Ex. 6.  Rosen noted in the e-mail that AFDI could consider revisions to the ad to bring it into conformity with Section (a)(x).  Id. Ex. 6.  On August 29, 2014, AFDI responded through its counsel, declining to make any revisions and requesting a "formal and final administrative ruling" from the MTA regarding the Killing Jews ad.  Id. ¶ 96, Ex. 7.  On September 22, 2014, Rosen sent an e-mail to CBS Outdoor with MTA's formal determination refusing to run the Killing Jews ad on the basis of its noncompliance with Section (a)(x), and CBS Outdoor forwarded the e-mail to AFDI's counsel.  Id. ¶ 99, Ex. I.

On or about October 1, 2014, the plaintiffs brought this action against the defendants, alleging that the MTA's refusal to run the Killing Jews advertisement violated the First Amendment of the United States Constitution.  On November 28, 2014, the plaintiffs moved for a preliminary injunction enjoining the MTA from enforcing Section (a)(x) to preclude the Killing Jews ad.

## II.

To obtain a preliminary injunction, the plaintiffs "must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). Although a plaintiff need only show "serious questions" as to its likelihood of success in some situations, see Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 38 (2d Cir. 2010), the plaintiffs in this case seek "a mandatory injunction (one that will alter the status quo) rather than a prohibitory injunction (one that maintains the status quo)," and therefore "must show a clear or substantial likelihood of success." Hoblock v. Albany County Bd. Of Elections, 422 F.3d 77, 97 (2d Cir. 2005).

In a case alleging a First Amendment deprivation, if the plaintiffs show a substantial likelihood that their First Amendment rights are being violated, the "irreparable harm" prong of the preliminary injunction standard is met, because the "'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" N.Y. Magazine v. Metro. Transp. Auth., 136 F.3d 123, 127 (2d Cir.

13

1998) (quoting Deeper Life Christian Fellowship, Inc. v. Board of Educ., 852 F.2d 676, 679 (2d Cir. 1988); see also Elrod v. Burns, 427 U.S. 347, 373 (1976); New York Progress & Prot. PAC v. Walsh, 733 F.3d 483, 488 (2d Cir. 2013) ("When a party seeks a preliminary injunction on the basis of a potential First Amendment violation, the likelihood of success on the merits will often be the determinative factor.") (citation and quotation marks omitted).  In order to succeed on their motion for a preliminary injunction, the plaintiffs must show that they have a substantial likelihood of success on their First Amendment claim, that the balance of equities tips in their favor, and that requiring the MTA to run the plaintiffs' advertisement would be in the public interest.

### III.

The MTA determined that the ad in question violated its standards under MTA Standard § (a)(x), specifically the portion of the standard prohibiting material "the display of which the MTA reasonably foresees would imminently incite or provoke violence or other immediate breach of the peace."  The plaintiffs contend that the application of this standard to the Killing Jews ad violates their First Amendment rights.[3]  To

---

[3] The plaintiffs also contend that § (a)(x) is facially unconstitutional, but they devote only one small portion of their brief to this argument, and they ignore the standards for facial challenges under the First Amendment.  See

14

determine the plaintiffs' likelihood of success on the merits, the Court must consider: (1) whether the plaintiffs' ad is protected speech under the First Amendment; (2) the nature of the forum to which the MTA is limiting access; and (3) whether the justifications for the restriction satisfy the appropriate standard of review. See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 797 (1985).[4]

The defendants concede that the advertising space on their buses constitutes a designated public forum under binding Second Circuit precedent. See N.Y. Magazine, 136 F.3d at 130. The defendants also concede that their refusal to display the advertisement was based on its content, and that therefore strict scrutiny applies if the advertisement qualifies as protected speech. See AFDI v. MTA, 880 F. Supp. 2d at 475. Thus, the resolution of this motion depends on whether the advertisement is protected speech under the First Amendment,

---

United States v. Stevens, 559 U.S. 460, 472-73 (2010) (discussing facial challenge standards in the First Amendment context). The plaintiffs' challenge to § (a)(x) as applied to the advertisement in question is sufficient to resolve this case.

[4] The defendants suggest that the Court need not reach the First Amendment question if the Court finds that the MTA did not apply its own standards properly when it excluded the advertisement under § (a)(x). The defendants do not provide a legal basis for this Court to enforce the internal regulations of a state public authority and the defendants do not explain why the plaintiffs would have a claim for relief based on the MTA's erroneous application of its policy. Therefore, the Court must evaluate whether the MTA's application of its standard violated the First Amendment.

and, if it is, whether the MTA's exclusion of the ad satisfies strict scrutiny in this case.

### A.

The defendants contend that they permissibly excluded the Killing Jews ad because it falls into two separate categories of unprotected speech: "fighting words," see Chaplinsky v. New Hampshire, 315 U.S. 568, 572 (1942), and incitement of violence or lawlessness, see Brandenburg v. Ohio, 395 U.S. 444, 447 (1969).  However, this case plainly does not present the rare occurrence where one of these seldom-applied categories is met.

### i.

In Chaplinsky, the Supreme Court held that "fighting words"—words which "by their very utterance inflict injury or tend to incite an immediate breach of the peace"—were never meant to be protected by the First Amendment.  315 U.S. at 572. The Court affirmed a conviction under a New Hampshire statute that had been construed to "[do] no more than prohibit the face-to-face words plainly likely to cause a breach of the peace by the addressee, words whose speaking constitute a breach of the peace by the speaker . . . ."  Id. at 573.  In Cohen v. California, 403 U.S. 15 (1971), the Court narrowed the "fighting words" doctrine to speech that is "directed to the person of the hearer" and likely to evoke a violent response.  Id. at 20

16

(internal quotation marks and citation omitted).[5]  The defendants cite no case in which a message communicated in advertising space has been held to constitute the type of "personally abusive epithets," directed at an individual, that are not protected by the First Amendment.  Id.  Indeed, in considering whether the AFDI "Savages" ad constituted fighting words, the United States District Court for the District of Columbia held that "[a]s a message communicated in advertising space, Plaintiffs' speech does not meet the Court's description [of fighting words]."  Am. Freedom Def. Initiative v. Washington Metro. Area Transit Auth., 898 F. Supp. 2d 73, 80 (D.D.C. 2012).

Moreover, even if there were an advertisement that could fall into this category, the ad in question plainly does not contain "fighting words."  Although the ad may be jarring to some and offensive to others, the defendants have not shown that the ad's recitation of the quote from Hamas TV would tend to incite an "immediate breach of the peace."  Provost v. City of Newburgh, 262 F.3d 146, 160 (2d Cir. 2001) (emphasis in original) (citation and quotation marks omitted).  Accordingly,

---

[5] After the Court in Chaplinsky affirmed the conviction of a Jehovah's Witness for publicly berating and insulting a government officer, 315 U.S. at 574, the Court never again upheld a conviction under the fighting words doctrine. See Am. Freedom Def. Initiative v. Washington Metro. Area Transit Auth., 898 F. Supp. 2d 73, 80 n.10 (D.D.C. 2012) (noting same).  Similarly, the Second Circuit Court of Appeals appears never to have found the doctrine applicable.

the Killing Jews ad does not constitute unprotected fighting words.

**ii.**

In a per curiam Opinion in <u>Brandenburg</u>, the Supreme Court struck down the Ohio Criminal Syndicalism Statute and reversed the conviction of a member of the Ku Klux Klan for urging "revengeance" for the "continue[d] . . . suppress[ion] [of] the white, Caucasian race."  395 U.S. at 446.  The Court held that a state may not proscribe "advocacy of the use of force" except where it is "directed to inciting or producing imminent lawless action and is likely to incite or produce such action."  <u>Id.</u> at 447.  As with the fighting words doctrine, the Supreme Court has rarely applied the <u>Brandenburg</u> incitement standard, and never explicitly found speech to be on the proscribable side of the standard.[6]

---

[6] <u>See</u> Erwin Chemerinsky, <u>Constitutional Law</u> 1328 (4th ed. 2013).  In some cases where the Supreme Court has rejected First Amendment challenges, dissenting opinions have suggested that the majority's holding contravened the <u>Brandenburg</u> standard, but in every such case the majority either did not address <u>Brandenburg</u> or held that it was inapplicable.  <u>See, e.g.</u>, <u>Holder v. Humanitarian Law Project</u>, 561 U.S. 1, 51 (2010) (Breyer, J., dissenting) (arguing that to the extent statute barring support to foreign terrorist organizations prohibited the advocacy of unlawful activity, it violated <u>Brandenburg</u> standard); <u>United States v. Williams</u>, 553 U.S. 285, 322 (2008) (Souter, J., dissenting) (arguing that Act prohibiting proposals to exchange child pornography was not "grounded in a realistic, factual assessment of harm," as required by <u>Brandenburg</u>).

18

The Court's subsequent substantive discussions of
Brandenburg reveal no precise contours of the standard, but make
clear that there must be "evidence or rational inference from
the import of the language, that [the words in question] were
intended to produce, and likely to produce, imminent" lawless
action. Hess v. Indiana, 414 U.S. 105, 109 (1973) (per curiam)
(reversing conviction of protestor who yelled, "We'll take the
[expletive] street later," amid crowd of protestors ordered to
disperse). "[M]ere advocacy of the use of force or violence
does not remove speech from the protection of the First
Amendment," and whether lawless action actually imminently
results from the speech may be considered. N.A.A.C.P. v.
Claiborne Hardware Co., 458 U.S. 886, 902, 927-28 (1982)
(emphasis in original) (reversing civil judgment against the
NAACP and its field secretary for "emotionally charged rhetoric"
in front of crowds of people, including the statement, "'If we
catch any of you going in any of them racist stores, we're gonna
break your damn neck'"). The invocation of Brandenburg in order
to restrict speech requires "careful consideration of the actual
circumstances surrounding such expression," and may not be
upheld simply on the basis of the "potential for the breach of
the peace." Texas v. Johnson, 491 U.S. 397, 409 (1989).

19

The defendants admit that the actual intention of the advertisement is not to advocate the use of force, but to parody the CAIR "My Jihad" campaign and to criticize Hamas and radical Islam.  However, they argue that a reasonable New Yorker would not read the advertisement this way, but would instead read it as advocating the killing of Jewish people.[7]  The defendants contend that a small subset of people may be spurred to violent acts by the line "That's his Jihad. *What's Yours*?"  The defendants suggest that this line could be read as an implicit command to follow the Hamas quote and commit violent acts against Jewish people.[8]

The defendants' theory is thoroughly unpersuasive.  The advertisement, which clearly attributes the "killing Jews" quote to Hamas MTV and contains a visible attribution of the ad to AFDI, and not to Hamas, does not appear to be advocating violence on its face.  It is also unclear who the ad is

---

[7] The plaintiffs argue that Brandenburg has a subjective intent requirement, and that it is therefore dispositive that their undisputed intent is not to incite violence.  While neither the Supreme Court nor the Second Circuit Court of Appeals has squarely addressed the issue, the plaintiffs point to no case in which a court has analyzed the speaker's subjective intent as dispositive under Brandenburg.  Because the plaintiffs' speech is protected by the First Amendment under an objective reading of the Brandenburg standard, the Court need not resolve this issue.

[8] The Court rejects out of hand Diaz's suggestion in his testimony that the defendants can exclude the ad simply because it advocates killing, without regard to any possible consequences.  Tr. 100.  The defendants may not exclude speech on the basis of "mere advocacy," Claiborne Hardware, 458 U.S. at 927, and no fair reading of the ad could indicate that the ad is really advocating murder.

targeting in its purported advocacy.  The defendants contend that the advertisement could be read as urging a subset of Islamic extremists to follow Hamas's command, but if that group is as violent and radicalized as the defendants contend, presumably they would not need a bus advertisement to remind them of Hamas's interpretation of the Quran.  Accordingly, "it cannot be said" that the advertisement is "advocating, in the normal sense, any action," Hess, 414 U.S. at 108-09, and the defendants thus cannot show the ad is "directed to" inciting violence.

The defendants also cannot point to any objective evidence to support their concerns that the advertisement is an imminent incitement of violence.  There is no evidence of any violent responses to this same advertisement when it ran in Chicago and San Francisco, or even to any similar ad in any city.  The defendants contend that New York City is different from those cities because the CAIR "My Jihad" campaign ran in Chicago and San Francisco, but not in New York, and New Yorkers thus would not understand the parodic aspect of the AFDI ad.  But this distinction does not create a rational inference that supports a likelihood of the incitement of violence.  It is not reasonable to assume that if the CAIR campaign had run in New York in early 2013, most New Yorkers would have been familiar enough with

those ads to appreciate the parody, but that without those ads, most New Yorkers would see the Killing Jews ad as a call to violence.  Indeed, Diaz admitted in his testimony that he would have refused to run the advertisements even if the CAIR campaign had run in New York.  Tr. 77-78.

The defendants also distinguish New York City from the other cities on the basis that New York is a more prominent terrorism target, a distinction that the plaintiffs do not appear to contest.  However, the defendants may not exclude speech based merely on a generalized, heightened "potential" for violent acts due to the city in which the ad would be shown. See Johnson, 491 U.S. at 409.  In order to show that the Killing Jews ad falls outside of the First Amendment's protection, the defendants must make some objective showing that *this* ad is directed at producing and likely to produce such violent actions.  The defendants have made no such showing.  Indeed, the defendants underestimate the tolerant quality of New Yorkers and overestimate the potential impact of these fleeting advertisements.  It strains credulity to believe that New Yorkers would be incited to violence by ads that did not incite residents of Chicago and San Francisco to similar acts.  This is not to minimize the terror threats to New York City, but those threats do not arise from these fleeting advertisements.

22

Moreover, there is no evidence that seeing one of these advertisements on the back of a bus would be sufficient to trigger a violent reaction.  Therefore, these ads—offensive as they may be—are still entitled to First Amendment protection.

**B.**

A content-based restriction in a public forum, as the defendants concede their exclusion of the Killing Jews ad is, must survive strict constitutional scrutiny to stand—that is, it must be "justified by a compelling government interest and [be] narrowly drawn to serve that interest."  Brown v. Entm't Merchs. Ass'n, 131 S. Ct. 2729, 2738 (2011).

In support of their argument that they are furthering a compelling state interest by protecting public safety, the defendants principally cite the opinion of the District Court for the District of Columbia in AFDI v. WMATA and the opinion of the District Court for the Western District of Washington in Seattle Mideast Awareness Campaign ("SeaMAC") v. King Cnty., 771 F. Supp. 2d 1266, 1277 (W.D. Wash. 2011), which has since been affirmed.  See SeaMAC v. King Cnty., No. 11-35914, 2015 WL 1219330, at *17 (9th Cir. Mar. 18, 2015).  But unlike in this case, the defendants in those cases presented actual objective evidence of a threat to public safety.  See AFDI v. WMATA, 898 F. Supp. 2d at 82 (finding a compelling interest in public

safety where defendants had received warnings from the
Department of Homeland Security and the Transportation Security
Administration about the timing of the proposed advertisement
and pointed out safety concerns inherent to the subway system);
SeaMAC, 2015 WL 1219330, at *2 (describing numerous specific
threats to public safety arising from proposed advertisement).[9]
Prior restraints on protected speech are subject to a "heavy
presumption" against their constitutional validity.  Lusk v.
Vill. of Cold Spring, 475 F.3d 480, 485 (2d Cir. 2007) (quoting
Org. for a Better Austin v. Keefe, 402 U.S. 415, 419 (1971))
(internal quotation marks omitted).  The defendants have not
satisfied their burden in this case by reference to generalized
security concerns unconnected to the advertisement at issue in
this case.

Moreover, the defendants' exclusion of the Killing Jews ad
is not narrowly tailored to achieve their security interests.
Rather than banning an advertisement outright, the transit
authorities could run the disputed advertisement with adjacent
disclaimers, or counter-advertisements, expressing disagreement
with the ad and/or explaining its context.  See AFDI v. WMATA,

---

[9] In any event, reliance on SeaMAC in this case would be misplaced because the
Court of Appeals for the Ninth Circuit held that the public authority's bus
advertising space is a "limited, rather than designated, public forum."  2015
WL 1219330, at *5.  That is contrary to controlling Second Circuit precedent.
See N.Y. Magazine, 136 F.3d at 130.

898 F. Supp. 2d at 83 (stating that WMATA could have "distance[d] itself from Plaintiffs' sentiments with accompanying statements and/or advertisements which conveyed its disagreement and explained its constitutional obligations"); Geller Decl. ¶ 30 (noting San Francisco's use of counter-advertisements).  An adjacent advertisement countering the quote from Hamas or stating that the entire AFDI ad is parody would be less restrictive of the plaintiffs' First Amendment rights than excluding the ad altogether.[10]

The Court is sensitive to the defendants' security concerns, and fully appreciates the efforts they must take to keep New Yorkers safe from possible violent attacks.  The defendants' cited examples of violent attacks show that individuals may commit heinous acts without warning and with little prompting.  But under the First Amendment, the fear of such spontaneous attacks, without more, cannot override individuals' rights to freedom of expression.  Accordingly, the plaintiffs have shown a substantial likelihood of success on the merits of their First Amendment challenge.

---

[10] The defendants argue that the counter messages in those cases were used to oppose ads that were more directly demeaning of Muslims, and that an explanatory message would not be as helpful in this case because it would be far more difficult to explain in a bus advertisement the parodic aspects of the Killing Jews ad.  However, the ad does not reasonably incite violence and the defendants underestimate the power of counter-advertisements to explain that the MTA does not endorse the ad and that the ad is not to be taken seriously.

**IV.**

In determining whether the balance of the equities tips in the plaintiffs' favor and whether granting the preliminary injunction would be in the public interest, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Winter, 555 U.S. at 24 (quoting Amoco Production Co. v. Gambell, 480 U.S. 531, 542 (1987)) (internal quotation marks omitted). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." Id. (quoting Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982)).

Both the balance of equities and the public interest in this case favor granting the preliminary injunction for the plaintiffs. "[S]ecuring First Amendment rights is in the public interest." New York Progress, 733 F.3d at 488. In arguing that granting the injunction is against the public interest, the defendants point to the global and local threat posed by terrorism. But as explained throughout this opinion, such generalized fears, only tangentially connected to the ad in question, do not outweigh the public interest in protecting

26

First Amendment rights.  Moreover, the Court is only enjoining the enforcement of Section (a)(x) as to the ad in question, rather than striking down the whole standard.  Finally, the Court will stay the effective date of this Opinion for 30 days, so that the defendants may consider their options for proceeding.

Accordingly, the plaintiffs' motion for a preliminary injunction of the MTA's restriction of the plaintiffs' advertisement is **granted**.

**CONCLUSION**

The Court has considered all of the arguments of the parties.  To the extent not specifically addressed above, the remaining arguments are either moot or without merit.  For the reasons discussed above, AFDI's motion for a preliminary injunction enjoining the MTA's exclusion of the advertisement in question is **granted.**  The Clerk is **directed to close Docket No. 12.**

In order to enable the defendants to consider their appellate options and methods for display of the proposed advertisement, the Court, in the public interest, will stay the effect of this Order for 30 days.  Absent a court order extending it, this stay will expire 30 days after the date of this opinion.

**SO ORDERED.**

**Dated:    New York, New York**
**          April 20, 2015        _____/s/_____**
                                  **John G. Koeltl**
                       **United States District Judge**