**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

**AMERICAN FREEDOM DEFENSE INITIATIVE,**
**ET AL.,**

               **Plaintiffs,**

      - against -

**METROPOLITAN TRANSPORTATION**
**AUTHORITY, ET AL.,**

              **Defendants.**
_____

**14 Cv. 7928 (JGK)**

**OPINION AND ORDER**

**JOHN G. KOELTL, District Judge:**

    This case began when the defendant, the Metropolitan Transportation Authority ("MTA"), excluded from its advertising space on buses a controversial political advertisement submitted by the plaintiffs, the American Freedom Defense Initiative ("AFDI") and its cofounders.  In this Court's previous decision, the Court held that when the MTA excluded the ad based solely on the MTA's policy prohibiting ads that imminently incite violence, the MTA violated the First Amendment.  Accordingly, the Court granted the plaintiffs' motion for a preliminary injunction enjoining the MTA's enforcement of its policy to prohibit the ad, but stayed the effect of the injunction for 30 days to allow the defendants to consider their options for appeal and methods for displaying the proposed advertisement. Shortly thereafter, the MTA, in what it contends was an action it had been considering for some time, amended its regulations

to prohibit the display of *all* political advertisements on MTA property (the "New Policy").  The MTA now moves to dissolve the preliminary injunction order, arguing that the plaintiffs' prior claims for injunctive relief are moot because they were directed at the MTA's exclusion of the ad under a different regulation, whereas the MTA is now excluding the ad under its New Policy barring all political ads.

The MTA's ban of all political ads is a dramatic change of circumstances from when the Court issued the preliminary injunction order.  The Court's grant of the preliminary injunction was based on the MTA's enforcement of its standard prohibiting ads that "would imminently incite or provoke violence or other immediate breach of the peace," but the MTA's exclusion of the plaintiffs' ad is no longer based on that standard.  The Court analyzed the defendants' exclusion of the ad under strict scrutiny because the MTA's advertising space constituted a "designated public forum" under binding Second Circuit precedent.  N.Y. Magazine v. Metro. Transp. Auth., 136 F.3d 123, 130 (2d Cir. 1998).  However, the status of MTA buses as a designated public forum was based largely on the MTA's acceptance of political advertisements.  Id.  Because the MTA no longer accepts any political advertisements, a different standard of review likely applies under the First Amendment.

In sum, the defendants' adoption of the New Policy has rendered this Court's preliminary injunction moot.  The plaintiffs argue that the New Policy and the manner in which the MTA enacted the New Policy are unconstitutional, but those allegations should be made in an amended complaint, which is not before the Court.  It is plain that the legal basis for this Court's preliminary injunction has now been removed.  Accordingly, the defendants' motion to vacate the preliminary injunction is **granted.**

## I.

The factual history of this case is set forth in the Court's opinion and order granting the plaintiffs' motion for a preliminary injunction.  Am. Freedom Def. Initiative v. Metro. Transp. Auth. ("AFDI v. MTA II"), No. 14cv7928, 2015 WL 1775607, at *1-5 (S.D.N.Y. Apr. 20, 2015).  The Court assumes the parties' familiarity with that opinion.  The following factual and procedural background is provided for its relevance to the current motion.

On April 20, 2015, this Court granted the plaintiffs' motion for a preliminary injunction enjoining the MTA's exclusion of the plaintiffs' ad criticizing Hamas, which the parties termed the "Killing Jews" ad.  Id. at *1.  The ad includes a quote from "Hamas MTV": "Killings Jews is Worship

3

that draws us close to Allah." Underneath the quote, the ad
stated: "That's His Jihad. *What's yours?*" The plaintiffs had
sought to run that ad on MTA buses. The MTA refused to run the
ad based on Section (a)(x) of the MTA's standards, which
prohibited ads that the MTA reasonably foresees would
"imminently incite or provoke violence or other immediate breach
of the peace." <u>See</u> Compl. ¶ 1. Because the MTA had not shown
that there was any objective evidence to support its contention
that the ad was likely to incite imminent violence, and because
the MTA rejected the ad based on its content without a
compelling interest or a response narrowly tailored to achieving
any such interest, the Court granted the plaintiffs' motion for
a preliminary injunction enjoining the MTA from excluding the
advertisement under Section (a)(x) of its standards. <u>AFDI v.
MTA II</u>, 2015 WL 1775607, at *1. The Court made clear that it
was only enjoining the MTA's enforcement of Section (a)(x) to
reject the Killings Jews ad, rather than striking down the whole
standard or granting any other relief. <u>Id.</u> at *10. In order to
enable the defendants to consider their appellate options and
methods for display of the proposed advertisement, the Court
stayed the effect of the preliminary injunction order for 30
days. <u>Id.</u>

4

The defendants did not appeal the Court's April 20 order, but instead, shortly after the opinion was issued, informed the Court that the MTA Board would be voting soon on whether to revise the MTA's standards to prohibit *all* political advertisements on MTA property.  See Letter Dated Apr. 24, 2015 (ECF No. 34).  On April 29, 2015, after holding a public meeting on the proposal, the MTA Board voted 9-2 to adopt the MTA's New Policy limiting its acceptance of political ads.  See Rosen Decl. (ECF No. 46) ¶ 69.  Specifically, Section IV.B of the New Policy prohibits any advertisement that falls into the following two categories:

1. Promotes or opposes a political party, or promotes or opposes any ballot referendum or the election of any candidate or group of candidates for federal, state, judicial, or local governmental offices.

2. Is political in nature, including but not limited to advertisements that either:

   a. Are directed or addressed to the action, inaction, prospective action or policies of a governmental entity, except as permitted in [sections allowing governmental advertising and public service announcements]; or

   b. Prominently or predominantly advocate or express a political message, including but not limited to an opinion, position, or viewpoint regarding disputed economic, political, moral, religious or social issues or related matters, or support for or opposition to disputed issues or causes.

Id. Ex. J.  The New Policy explicitly provides that one of its purposes is to "convert the MTA's Property from a designated

public forum into a limited public forum," and that in doing so,
it seeks to, among other things, "maintain a safe and welcoming
environment for all MTA employees and customers," and "minimize
the resources and attention that have been expended to resolve
disputes relating to the permissibility of certain political
advertisements." Id. The New Policy does not amend any of the
MTA's other existing standards, including the incitement
standard the MTA previously used to exclude the Killing Jews ad.

The MTA's New Policy took effect immediately after it was
adopted. Id. ¶ 74. Defendant Jeffrey Rosen, the MTA Director
of Real Estate, determined that the Killing Jews ad falls within
Section IV.B.2 because it is "political in nature," and thus
would not be run. Id. On May 5, 2015, the MTA notified the
plaintiffs about its determination by e-mail. Id. Ex. K. On
May 14, 2015, the defendants moved to dissolve the Court's
preliminary injunction order.

## II.

The defendants argue that the MTA's amendment to its
regulations has rendered the Court's preliminary injunction
order moot because they are no longer excluding the Killing Jews
ad on the unconstitutional basis identified in that order, and
the New Policy converts the MTA's advertising space from a
designated public forum into a limited public forum. The

plaintiffs argue that their claim for injunctive relief is not
moot for several reasons, including that the New Policy remains
unconstitutional, that the defendants amended their policy only
to suppress the plaintiffs' views, and that the plaintiffs
acquired vested rights under the Court's prior order.  For the
reasons that follow, the Court agrees with the defendants that
the plaintiffs' request for injunctive relief is now moot.

**A.**

The defendants bear a "heavy burden" in showing that the
plaintiffs' claims for injunctive relief have become moot.[1]
Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528
U.S. 167, 189 (2000).  "The voluntary cessation of allegedly
illegal conduct usually will render a case moot if the
defendant[s] can demonstrate that (1) there is no reasonable
expectation that the alleged violation will recur and (2)
interim relief or events have completely and irrevocably
eradicated the effects of the alleged violation."  Granite State
Outdoor Adver., Inc. v. Town of Orange, Conn., 303 F.3d 450, 451
(2d Cir. 2002) (per curiam) (quoting Campbell v. Greisberger, 80

---

[1] Contrary to the plaintiffs' assertions, the defendants are not arguing that
this entire case should be dismissed as moot, or that this Court no longer
has jurisdiction to enforce the preliminary injunction order.  Indeed, the
MTA concedes that the plaintiffs may have live claims for nominal damages and
attorneys' fees.  See Mem. of L. in Supp. of Defs' Mot. to Dissolve Inj. (ECF
No. 45), at 15 n.9.  Rather than moving to dismiss the case, the defendants
are moving to dissolve the court's preliminary injunction order as moot
because it was decided under circumstances that no longer exist.

F.3d 703, 706 (2d Cir. 1996) (internal quotation marks
omitted)); see also Lamar Adver. of Penn, LLC v. Town of Orchard
Park, New York, 356 F.3d 365, 375-76 (2d Cir. 2004).  "While a
defendant's 'voluntary cessation of a challenged practice does
not deprive a federal court of its power to determine the
legality of the practice,' it is nonetheless 'an important
factor bearing on the question whether a court should exercise
its power' to entertain a request for injunctive relief or
declare it moot."  Holland v. Goord, 758 F.3d 215, 223 (2d Cir.
2014) (quoting City of Mesquite v. Aladdin's Castle, Inc., 455
U.S. 283, 289 (1982)).

     In this case, the only conduct that the Court previously
enjoined as unconstitutional was the defendants' exclusion of
the Killing Jews ad under the "incitement of violence" standard.
The defendants are now only excluding the Killing Jews ad under
the New Policy banning political ads, a policy they assert that
they have no plans of revising.  Rosen Decl. ¶¶ 73, 76.  Thus,
the defendants have ceased the conduct that the Court identified
as unconstitutional, and the Court must determine whether there
is a reasonable expectation that that illegal conduct will
recur.  Here, as in Granite State, "there is no reason to think
that, having . . . revised its regulations through proper
procedures, the [MTA] has any intention of returning to" its

enforcement of the prior regulations.  303 F.3d at 451-52.  Some
deference must be afforded to the representations of a public
authority that certain conduct has been discontinued.  <u>Lamar</u>
<u>Adver.</u>, 356 F.3d at 376.  In this case it would be completely
unrealistic to believe that the MTA would return to rejecting
the Killing Jews ad based on the "incitement of violence"
standard, which the Court found to be unconstitutional as
applied to that ad.  The MTA has adopted a new standard that
would prohibit the ad and has limited the nature of its forum
such that the entire class of political ads is prohibited.

The plaintiffs appear to suggest that the MTA may return to
its unconstitutional conduct based on the MTA's purported "long
history" of unlawfully restricting the plaintiffs' speech.  <u>See</u>
<u>People Against Police Violence v. City of Pittsburgh</u>, 520 F.3d
226, 231 n.2 (3d Cir. 2008) (rejecting the City's mootness
argument based on its representation that it would no longer
enforce an ordinance because the City had a "long history of
unconstitutional conduct").  But in making this argument, the
plaintiffs exaggerate the history between the AFDI and the MTA.
The plaintiffs can point to only three instances, including the
present case, in which the MTA attempted to exclude the AFDI's
many controversial advertisements.  In the only two instances

9

that necessitated injunctive relief for the plaintiffs,[2] neither Judge Engelmayer nor this Court questioned the MTA's good faith in attempting to find the line between enforcing its regulations and respecting the plaintiffs' free speech rights.  See Am. Freedom Def. Initiative v. Metro. Transp. Auth. ("AFDI v. MTA I"), 880 F. Supp. 2d 456, 477 (S.D.N.Y. 2012) ("In holding today that MTA's no-demeaning standard violates the First Amendment, the Court does not impugn in the slightest the motives of MTA and its officials.").  Indeed, when the MTA rejected the Killing Jews ad, it accepted several other controversial AFDI advertisements for display.  See AFDI v. MTA II, 2015 WL 1775607, at *3.  Here, as in Lamar Advertising, there is "nothing on this record" that would lead the Court to believe that the MTA would "return to the [unconstitutional] state of affairs that existed" before the plaintiffs filed suit.  356 F.3d at 377 (holding that claims for injunctive relief were moot where Town amended regulations after the plaintiff filed suit).

**B.**

"Of course, a plaintiff's claims will not be found moot where the defendant's amendments are merely superficial or the law, after amendment, suffers from similar infirmities as it did

---

[2] The plaintiffs point to one instance where they submitted an advertisement that the MTA originally refused to accept, but then relented soon after the plaintiffs filed suit.  Geller Decl. ¶¶ 9-16.

at the outset." Id. at 378.  The plaintiffs raise several

arguments as to why the MTA's actions and its amended regulatory

scheme remain unconstitutional: (1) the amendments were

motivated by a desire to suppress the plaintiff's viewpoint; (2)

the Killing Jews ad does not qualify as "political in nature"

under the New Policy; and (3) the New Policy is facially

invalid.  As an initial matter, as in Lamar Advertising, the

plaintiffs have not amended their complaint to raise these new

claims, and thus they are not properly before the Court.  Id.

Amending their complaint would allow the plaintiffs to assert

the precise as-applied and facial First Amendment claims they

are alleging against the MTA and the New Policy, conduct

discovery on these claims, and better develop the record before

this Court under these changed circumstances.[3]

       For purposes of the current motion, however, the defendants

have shown that their change in policy has "sufficiently

altered" the circumstances underlying this case "so as to

present a substantially different controversy from the one that

existed when this suit was filed."  Id. (internal quotation

marks omitted).  And the plaintiffs have failed to show at this

---

[3] The plaintiffs request that the Court withhold its ruling on this motion for
three months while the plaintiffs conduct discovery on the MTA's amendment of
its standards.  But there is no basis to hold the preliminary injunction in
abeyance any longer, rather than allowing the plaintiffs to amend their
complaint, after which they may then conduct discovery on the allegations in
the amended complaint.

point that their allegations are likely to justify injunctive relief.

When the government provides a forum for private speech, the nature of that forum determines the level of scrutiny that courts apply to government restrictions of that speech. See Cornelius v. NAACP Legal Defense & Ed. Fund, Inc., 473 U.S. 788, 800 (1985). In the plaintiffs' initial motion, the defendants conceded that the MTA's advertising space was a designated public forum under the binding Second Circuit precedent of N.Y. Magazine. See AFDI v. MTA II, 2015 WL 1775607, at *6. Therefore, because the Killing Jews ad qualified as protected speech and the defendants restricted it based on its content, the Court applied strict scrutiny to the defendants' conduct and required that their exclusion of the ad be "justified by a compelling government interest and [be] narrowly drawn to serve that interest." Id. at *6, 9 (quoting Brown v. Entm't Merchs. Ass'n, 131 S. Ct. 2729, 2738 (2011) (internal quotation marks omitted)). However, the Court of Appeals in N.Y. Magazine made clear that its holding labeling the MTA's advertising space a designated public forum was based almost entirely on the MTA's allowance of political speech, which "evidence[d] a general intent to open a space for discourse, and a deliberate

acceptance of the possibility of clashes of opinion and controversy." 136 F.3d at 130.

Although the MTA's advertising space remained a designated public forum in the time since N.Y. Magazine, the MTA "is not required to indefinitely retain the open character" of its property. Children First Found., Inc. v. Fiala, No. 11-5199-CV, 2015 WL 2444501, at *6 (2d Cir. May 22, 2015) (quoting Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 46 (1983)). Indeed, "the government may decide to close a designated public forum." Make The Rd. by Walking, Inc. v. Turner, 378 F.3d 133, 143 (2d Cir. 2004). As the Court of Appeals recognized in N.Y. Magazine, if allowing political speech shows an intent to open the forum, "[d]isallowing political speech, and allowing commercial speech only, indicates that making money is the main goal." 136 F.3d at 130.

Accordingly, the Supreme Court and several courts of appeals have made clear that public authorities are not required to accept political advertisements, and when they exclude such ads, they create a limited public or nonpublic forum. See, e.g., Lehman v. City of Shaker Heights, 418 U.S. 298, 303-04 (1974) (plurality opinion) (holding that no First Amendment forum existed where City only allowed commercial advertising on its transit system property); Lebron v. Nat'l R.R. Passenger

13

Corp. (Amtrak), 69 F.3d 650, 656 (2d Cir.) (holding that Amtrak billboard was a limited public forum in light of its exclusion of political speech), opinion amended on denial of reh'g, 89 F.3d 39 (2d Cir. 1995); Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp. ("AFDI v. SMART"), 698 F.3d 885, 890 (6th Cir. 2012) ("SMART has banned political advertisements, speech that is the hallmark of a public forum."). Most recently, the Second Circuit Court of Appeals held that the custom license plate program directed by the New York Department of Motor Vehicles ("DMV") was a nonpublic forum because the DMV "consistently exclud[ed] controversial political speech" from the program. Children First, 2015 WL 2444501, at *8.[4]

In light of these precedents, it is likely that the MTA's exclusion of all political ads has converted its advertising

_____

[4] In Children First, the Court of Appeals held its mandate pending the Supreme Court's decision regarding a challenge to the Texas custom license plate program in Walker v. Texas Div., Sons of Confederate Veterans, Inc., 135 S.Ct. 752 (2014). Children First, 2015 WL 2444501, at *20. Two days after oral argument was held on this motion, the Supreme Court issued its decision in Walker v. Texas Div., Sons of Confederate Veterans, Inc., 576 U.S. ___ (2015), holding that Texas's custom license plate program constitutes government speech, and thus forum analysis does not apply. Id. at *6, 13. The Court distinguished the license plate program from the "advertising on city buses" found to be a nonpublic forum in Lehman because the bus advertisements were "located in a context (advertising space) that is traditionally available for private speech," and because "the advertising space, in contrast to license plates, bore no indicia that the speech was owned or conveyed to the government." Id. at *16-17. Accordingly, forum analysis remains appropriate in this case, which, like Lehman, concerns the advertising space on city buses.

space from a designated public forum to a limited public forum
or a nonpublic forum.[5]  The plaintiffs argue that the above cases
should not apply because in those cases, the defendants allowed
*only* commercial advertising, whereas the MTA's New Policy still
allows public service announcements.  While the plaintiffs may
seek to develop this claim further in the context of a facial
challenge in an amended complaint, it is sufficient to note here
that courts have not been that restrictive.  For example, in the
amended opinion in Lebron, the Court of Appeals noted that
Amtrak's allowance of many "public service announcements" on its
billboard space did not convert it to a designated public forum.
89 F.3d at 40; see also AFDI v. SMART, 698 F.3d at 892-93
(holding that transit agency that excluded political ads but
allowed public service ads created nonpublic forum).  The
holding in N.Y. Magazine was premised on the allowance of
political speech and "clashes of opinion and controversy," not
merely public service announcements.  136 F.3d at 130.

---

[5] A nonpublic forum is government property that has not been opened for
expressive activity by members of the public.  A restriction on speech in a
nonpublic forum need only be reasonable and viewpoint neutral.  See Children
First, 2015 WL 2444501, at *6.  A limited public forum is opened to certain
kinds of speakers and subjects.  Strict scrutiny is applied only to speech
that falls within the category that is opened.  Otherwise, restrictions need
only be reasonable and viewpoint neutral.  Id.  In this case, because the MTA
has excluded all political ads, the rejection of any ad as political is
analyzed by whether the exclusion is reasonable and viewpoint neutral,
regardless of whether the advertising space is a nonpublic or limited public
forum.

In a factually analogous case in the United States District Court for the Eastern District of Michigan, the plaintiff initially sought and was granted a preliminary injunction when a transit agency unconstitutionally excluded his advertisement that was critical of Israel.  Coleman v. Ann Arbor Transp. Auth., 947 F. Supp. 2d 777, 779 (E.D. Mich. 2013).  Thereafter, the transit agency amended its policy to exclude all political ads, and the district court held that the plaintiff's request for injunctive relief was moot because there was no "ongoing constitutional violation" and that the change in policy presented a "substantially different controversy than the one previously before [the] Court."  Id. at 783-85.  The same result is appropriate in this case.  With the MTA's change in policy, the Court's standard of review becomes more lenient than the strict scrutiny the Court applied in the preliminary injunction order.  Restrictions on access to a limited public forum must be viewpoint neutral and reasonable.  Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the Law v. Martinez, 561 U.S. 661, 679 (2010).  Because the MTA is no longer enforcing the regulations at issue in the Court's prior order, and because their actions likely would be subject to a different legal standard, the plaintiffs' request for injunctive relief is moot.

16

## C.

The plaintiffs argue that their request for injunctive relief is still live because they acquired vested rights under state law after this Court initially granted their preliminary injunction motion. "[A] party may avert mootness of its claim if it demonstrates that, prior to the amendment it accrued certain property rights or fixed expectations protected under state law." Lamar Adver., 356 F.3d at 379. However, the plaintiffs have not shown that they acquired any vested rights under state law prior to the MTA's enactment of the New Policy. See id. (holding that the plaintiff challenging sign ordinance under the First Amendment did not acquire any vested rights under New York state law).

To show they have acquired vested rights under New York law, the plaintiffs rely entirely on Pokoik v. Silsdorf, 358 N.E.2d 874 (N.Y. 1976), in which the New York Court of Appeals held that the plaintiff was "entitled to a [a building] permit as a matter of right" due to his compliance with the application procedures before they were amended. Id. at 876. Subsequently, however, the New York Court of Appeals has made clear that the "special facts exception" relied upon in Pokoik is only applied in the context of land use disputes, and also requires "extensive delay indicative of bad faith," "unjustifiable

17

actions," or "abuse of administrative procedures" by municipal officials.  Rocky Point Drive-In, L.P. v. Town of Brookhaven, 999 N.E.2d 1164, 1167 (N.Y. 2013); see also Ellington Const. Corp. v. Zoning Bd. of Appeals, 566 N.E.2d 128, 132 (N.Y. 1990) ("The doctrine of vested rights has generally been described as an application of the constitutionally based common-law rule protecting nonconforming uses.").  The plaintiffs point to no case under New York law where an applicant acquired a vested right to run an advertisement on public property.  And Lamar Advertising explicitly rejected a similar claim.  356 F.3d at 379.

Accordingly, the plaintiffs have not shown that they acquired a vested right prior to the MTA's amendment of its regulations.

### D.

Finally, none of the as-applied or facial challenges that the plaintiffs assert against the New Policy in this motion warrant extending the Court's previous preliminary injunction order to enjoin the MTA from enforcing the New Policy to reject the Killing Jews ad.  Although the plaintiffs may assert these claims in an amended complaint in order to develop them further, based on the record currently before the Court, the plaintiffs have not shown that any of their challenges to the New Policy

18

have a strong likelihood of success on the merits.  See New York Progress & Prot. PAC v. Walsh, 733 F.3d 483, 488 (2d Cir. 2013) ("When a party seeks a preliminary injunction on the basis of a potential First Amendment violation, the likelihood of success on the merits will often be the determinative factor." (internal quotation marks omitted)).

The plaintiffs argue that the provision of the New Policy under which the Killing Jews ad is now excluded, which prohibits advertisements "regarding disputed economic, political, moral, religious or social issues or related matters," Rosen Decl. Ex. J, vests the MTA with too much discretion because it allows it to determine which issues are "disputed."  But that language is plainly an illustrative example of the New Policy's broader ban of any ad that is "political in nature."  Id.  Courts have found that such a "categorical ban against political advertising," even when "inartfully phrased," provides sufficient guidance to restrict the discretion of the government actor and survive facial challenges.  Lebron, 69 F.3d at 658; see also AFDI v. SMART, 698 F.3d at 893 (holding that policy prohibiting "political advertising" was "not so vague or ambiguous that a person could not readily identify the applicable standard" (brackets and internal quotation marks omitted)).  At this

19

stage, the plaintiffs have not shown that the New Policy's prohibition of political advertising is facially defective.

The plaintiffs also argue that the MTA's amendment of its policy was motivated by a desire to suppress the plaintiffs' speech in particular.  The plaintiffs cite Coleman in arguing that "changes to a forum motivated by actual viewpoint discrimination may well limit the government's freedo m of action."  947 F. Supp. 2d at 788.  However, if the New Policy is an otherwise constitutional blanket ban of political advertising, a purported illicit motive by the MTA may not be sufficient to invalidate it.  See United States v. O'Brien, 391 U.S. 367, 383 (1968) ("It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive.").

Moreover, as in Coleman, "there has been insufficient factual development on the issue of actual viewpoint discrimination."  947 F. Supp. 2d at 788.  The plaintiffs point to anti-AFDI statements made at the MTA's hearing that led to the New Policy, but those statements may have little or no bearing on the Board's decision to amend the policy.  See O'Brien, 391 U.S. at 384 ("What motivates one legislator to make a speech about a statute is not necessarily what motivates

scores of others to enact it."). The defendants assure the Court that this change in policy had been debated for some time, and they point to a history of contentious political advertisements displayed on MTA property. These advertisements come from many different groups, not just the AFDI, and cover a wide variety of controversial perspectives—on the Middle East conflict and Islam. See Rosen Decl. ¶¶ 45-55. The plaintiffs may have been especially vocal participants in the "sounding board for Middle East policy debates" that the MTA's property offered, id. ¶ 45, but the record suggests the MTA has silenced the entire debate on its property, not just the plaintiffs' ad. Indeed, the MTA points to other advertisements submitted in opposition to the AFDI's ads that the MTA has already rejected under the New Policy. See id. ¶ 79 (noting rejection of the satirical "The Muslims are Coming" campaign).

Some may regret the MTA's prohibition of political advertisements and the resulting loss of a public forum for heated political debate. But no law requires public transit agencies to accept political advertisements as a matter of course, and it is not for this Court to impose its own views on what type of forum the MTA should create. Just as the MTA created a designated public forum on its property by "invit[ing] . . . political speech" and the ensuing "clashes of opinion and

controversy," Children First, 2015 WL 2444501, at *7 (quoting

N.Y. Magazine, 136 F.3d at 130 (internal quotation marks

omitted)), the MTA may rescind that invitation in order to

reduce the political controversy amidst the MTA's day-to-day

operation of its public transit system.  The plaintiffs may

raise the question of whether the MTA's actions were

unconstitutional in an amended complaint.  But at this stage,

the plaintiffs' original request for injunctive relief is moot,

and the Court's preliminary injunction order should be vacated.

Accordingly, the defendants' motion to dissolve the preliminary

injunction order is **granted.**


## CONCLUSION

The Court has considered all of the arguments of the

parties.  To the extent not specifically addressed above, the

remaining arguments are either moot or without merit.  For the

reasons discussed above, the defendants' motion to dissolve the

preliminary injunction order issued by this Court on April 20,

2015, is **granted.**  The Clerk is **directed to close Docket No. 44.**


SO ORDERED.

Dated:      New York, New York
            June 19, 2015                  _____/s/_____
                                                John G. Koeltl
                                           **United States District Judge**

22